**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Jane Doe 1, an individual, Jane Doe 2, and Does 3-100,<br><br>        Plaintiffs,<br><br>v.<br><br>The Congregation of the Sacred Hearts of Jesus and Mary, Diocese of Fall River, a corporation sole, Sisters of the Sacred Hearts of Jesus and Mary, Sisters of Charity of Montreal, and Black and White Corporations 1-10,<br><br>        Defendants. | **Case No.:**<br><br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiffs, Jane Doe 1 and Jane Doe 2,[1] by and through their undersigned counsel, allege the following:

## **NATURE OF CLAIM**

1.      This case is brought under the New York Child Victims Act (L. 2019, ch. 11) ("CVA").

2.      Plaintiffs Jane Doe 1 and Jane Doe 2 (together referred to as "Plaintiffs"), were unlawfully and continuously subjected to ***hundreds*** of sexual offenses—including sexual intercourse, oral sex, fondling, and forced sexual touching—while elementary-aged boarding school students. The acts defined herein constitute sexual offenses as defined by New York Penal Law Article 130.

3.      Plaintiffs' abusers included Father James Porter ("Father Porter"), a priest serving under the Diocese of Fall River; Sister Mary Moffet, Sister Ursula, Sister Mary Felix, and Sister Mary Rose, nuns serving under the Sisters of the Sacred Hearts of Jesus and Mary (a/k/a "Sisters of the

---

[1] Plaintiffs are using the pseudonyms "Jane Doe 1" and "Jane Doe 2" in this Complaint in place of their real names. Plaintiffs intend to file a motion to proceed under pseudonyms on the basis of their privacy because their allegations concern childhood sexual abuse.

Sacred Hearts"); Sister M. Elizabeth, Sister Henri Thomas, and Sister Therese Du, nuns serving under the Sisters of Charity of Montreal (a/k/a "the Grey Nuns") (Collectively, the Sisters of the Sacred Hearts and the Grey Nuns are referred to as, "the Nuns").

4.      The Diocese of Fall River had control over Sacred Heart Academy and St. Joseph's Orphanage in Fairhaven, Massachusetts, where Defendants allowed many incidents of child sex abuse to take place.

5.      The Diocese of Fall River also had control over Father Porter, a known pedophile and sexual predator, who admitted to molesting over 100 young girls and boys at locations throughout the country.

6.      The Congregation of the Sacred Hearts of Jesus and Mary had control over "The Monastery" in Fairhaven, Massachusetts (a/k/a "The Provincial House a/k/a "The Damien Residence"), where Defendants harbored sexual predators like Father Porter and allowed many incidents of child sex abuse to take place.

7.      The Congregation of the Sacred Hearts of Jesus and Mary had control over Father William Carroll (Father Carroll"), the head priest at Sacred Heart Academy, who allowed Defendants to commit rampant acts of child sex abuse against Plaintiffs and other minors in his care.

8.      The Sisters of the Sacred Hearts had control over Sister Mary Moffet, Sister Ursula, Sister Mary Felix, and Sister Mary Rose, who committed and allowed pedophiles to commit rampant acts of child sex abuse against Plaintiffs and many other boarding students and orphans.

9.      The Grey Nuns had control over Sister M. Elizabeth, Sister Henri Thomas, and Sister Therese Du, who committed and allowed pedophiles to commit rampant acts of child sex abuse against Plaintiffs and many other boarding students and orphans.

10.     As minor children under the custody, care, and supervision of Defendants, Defendants owed Plaintiffs a duty to act *in loco parentis*—to fulfill the role of Plaintiffs' guardians.

11.     On information and belief, prior to, at the time of, and after Plaintiffs were under Defendants' custody, care, and supervision, rampant acts of child sex abuse—committed by Father Porter, the Nuns, and other pedophiles under Defendants' control—were brought to Defendants' attention.

12.     Defendants failed to terminate, demand the resignation of, or otherwise remove Father Porter, the Nuns, and the other pedophiles described herein until after Plaintiffs had already suffered years of sexual, physical, mental, and emotional trauma because of the abuse.

13.     Defendants also did not report the crimes described herein—including the murder of elementary-aged boarding school student Andrea Randall, which Plaintiffs witnessed—to law enforcement for criminal investigation at any time.

14.     On information and belief, Defendants' failure to terminate or otherwise remove Father Porter, the Nuns, and the other pedophiles described herein was driven by a fear of litigation and a fear of harming the reputation and finances of Defendants.

15.     The abuse Plaintiffs experienced at Defendants' hands was profound and unlawful in nature.

16.     Father Porter, the Nuns, and other pedophiles described herein used their positions of power to commit obscene and sickening acts of violence against Plaintiffs and the sanctity of their bodies.

17.     The extent of the perversion of trust and responsibility of these authority figures—who should have acted as the girls' educators, protectors, and spiritual advisors—cannot be understated

and reflects an extensive history of abuse engendered by the Diocese of Fall River, the Sisters of the Sacred Hearts, the Grey Nuns, and the Congregation of the Sacred Hearts of Jesus and Mary.

## PARTIES

18.    Plaintiffs incorporate all prior paragraphs of this Complaint as if fully set forth herein.

19.    Plaintiff Jane Doe 1 is a citizen of, resides in, and is domiciled in the State of New York.

20.    Plaintiff Jane Doe 2 is a citizen of, resides in, and is domiciled in the State of Georgia.

21.    During the time period when the abuse described herein occurred, Jane Doe 1 and Jane Doe 2 were minors, domiciled in the State of New York.

22.    As minors, Jane Doe 1 and Jane Doe 2 were sent to Sacred Heart Academy in Fairhaven, Massachusetts as boarding students.

23.    Defendants purposely availed themselves to citizens of the State of New York.

24.    Plaintiffs' mother received promotional materials in the form of "leaflets" from the Fall River Diocese and other Defendants, in which Sacred Heart Academy was represented as a proper boarding school for citizens of New York, including minor Plaintiffs.

25.    Plaintiffs' mother also received promotional material in the form of "leaflets" from the Fall River Diocese and Defendants, which represented priests and nuns under Defendants' direction and control as proper spiritual guides, educators, and guardians for minor children, including Plaintiffs.

26.    Because Defendants purposely availed themselves to citizens of the State of New York, Plaintiffs' mother paid tuition money for her daughters to board at Sacred Heart Academy and entrusted Defendants to act *in loco parentis*.

27.    Based on Defendants' representations, Plaintiffs' mother allowed Defendants to travel (drive) from the State of Massachusetts to the State of New York and transport (drive) her

daughters back to Sacred Heart Academy in Fairhaven, Massachusetts—where heinous acts of child sex abuse were committed against Plaintiffs immediately upon their arrival.

28.     Defendants' agents and employees committed, and conspired to commit, acts of sexual abuse and violence against Plaintiffs in the State of New York, as defined by New York Penal Law Article 130.

29.     Defendants' agents and employees also committed, and conspired to commit, sexual offenses against Plaintiffs in the States of Massachusetts, Connecticut, Rhode Island, New Hampshire, Vermont, and Maine.

30.     Defendants also illegally used minor Plaintiffs in sexual performances, as defined in New York Penal Law Section 263.05.

31.     The intentional and grossly negligent acts and omissions committed by Defendants—which constitute *sexual offenses*—caused injury to Plaintiffs' person and property.

32.     Pursuant to the CVA (CPLR §214-g), Defendants are liable to Plaintiffs for the injuries they proximately caused—including, but not limited to, great pain of mind and body, shock, mental anguish, emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, anger, rage, frustration, loss of enjoyment of life, loss of consortium, loss of love and affection, sexual dysfunction, past and future medical expenses for psychological treatment, therapy, and counseling, lost wages and employment opportunities, lost choses in action, and other compensation to which they were entitled.

## JURISDICTION AND VENUE

33.     Plaintiffs incorporate all prior paragraphs of this Complaint as if fully set forth herein.

34.     Jurisdiction exists pursuant to 28 U.S.C. §1332(a), based upon complete diversity of citizenship of the parties and the amount in controversy.

35.     Jane Doe 1 and Jane Doe 2 were residents of and domiciled in the State of New York when the acts of sexual abuse and violence were committed against them.

36.     Defendants transported Plaintiffs from their home in Brooklyn, New York across state lines to Massachusetts and proceeded to commit hundreds of acts of child sex abuse in New York and other States throughout the Northeastern United States—including Massachusetts, Connecticut, Rhode Island, Vermont, New Hampshire, and Maine.

37.     Today, Jane Doe 1 is a citizen of and domiciled in the State of New York; Jane Doe 2 is a citizen of and domiciled in the State of Georgia.

38.     Defendants Diocese of Fall River and Congregation of the Sacred Hearts of Jesus and Mary are citizens of and maintain their primary place of business in the State of Massachusetts.

39.     Defendant Sisters of Charity of Montreal (the "Grey Nuns") is a foreign citizen of and maintains its principal place of business in Canada.

40.     Defendant Sisters of the Sacred Hearts of Jesus and Mary ("Sisters of the Sacred Heart") is a citizen of and maintains its primary place of business in California.

41.     On information and belief, all Defendants are being sued under either their true name or common/assumed names. In the event any parties are misnamed or are not included herein, it is Plaintiffs' contention that such was a "misidentification," "misnomer," and amendment relating back to the original filing, pursuant to Federal Rule of Civil Procedure 15, should be allowed in interest of justice.

42.     Plaintiffs claim damages in this action in excess of $75,000.

43.    Venue is proper pursuant to 28 U.S.C. 1391(b) in that all or a substantial part of the events or omissions forming the basis of these claims occurred in the State of New York, which is within the jurisdiction of this Court.

### FACTS COMMON TO ALL COUNTS

44.    Jane Doe 1 and Jane Doe 2, the daughters of Cuban immigrants, were raised by their mother in Brooklyn, New York.

45.    In order to spare her children from the neighborhood violence and provide them with the best education possible, their mother went to great lengths to afford tuition payments to send Jane Doe 1 and Jane Doe 2 to a private Catholic school.

46.    Before attending Sacred Heart Academy, Jane Doe 1 and Jane Doe 2 attended St. Vincent De Paul—a Catholic school in Tarry Town, New York—for one year.

47.    After viewing leaflets and promotional material from Defendants which described Sacred Heart Academy's religious, academically rigorous atmosphere, the girls' mother was led to believe her daughters would receive a better Catholic education at Sacred Heart Academy than they were receiving at St. Vincent De Paul.

48.    Plaintiffs' family did not have a car when Jane Doe 1 and Jane Doe 2 were growing up; consequently, various Nuns and priests—under Defendants' direction, control, and supervision—were sent by Defendants to pick up Jane Doe 1 and Jane Doe 2 from their home in Brooklyn, New York.

49.    Immediately upon arriving at Sacred Heart Academy, Jane Doe 1 and Jane Doe 2 were subjected to heinous and continuous acts of child sex abuse by pedophiles under Defendants' direction, control, and supervision.

50.    The sexual abuse perpetrated against Jane Doe 1 and Jane Doe 2 was continuous—it

occurred on a near daily basis, starting when Plaintiffs arrived in Fairhaven, Massachusetts in 1964.

51.    The sexual abuse perpetrated against Jane Doe 1 and Jane Doe 2 did not consist of isolated or standalone incidents; these continuous acts only occurred because Defendants' educators and spiritual guides: (1) continuously and directly committed sexual offenses against Plaintiffs; and (2) conspired together to coverup these incidents of sexual abuse, allowing them to continue for years in locations throughout the Northeastern United States—including in the State of New York.

52.    Thus, the rampant and ongoing acts of child sex abuse began when Defendants took Jane Doe 1 and Jane Doe 2 from their home in Brooklyn, New York and they remained under the custody, care, and supervision of Defendants' agents and employees from approximately 1964 to 1970.

53.    Father Porter, Father Carroll, and the Sisters of the Sacred Hearts—including Sister Mary Moffet, Sister Ursula, Sister Mary Felix, and Sister Mary Rose —were acting in *in loco parentis* and entrusted with the custody, care, and supervision of Jane Doe 1 and Jane Doe 2 as boarding students at Sacred Heart Academy.

54.    The Grey Nuns—including Sister M. Elizabeth, Sister Henri Thomas, and Sister Therese Du—were present along with Sisters of the Sacred Heart when Jane Doe 1, Jane Doe 2, and other boarding students and orphans were sexually abused at St. Joseph's Orphanage; they assisted in sedating Plaintiffs before, during, and after they were sexually molested by Father Porter and other educators and spiritual guides under Defendants' control.

55.    Sisters of the Sacred Heart and the Grey Nuns were also often present with Jane Doe 1 and Jane Doe 2 during long car rides to and from the incidents of abuse; Plaintiffs remember they would tell the girls, "Let's go sing and dance," as they drove them at night to be sexually abused

by Father Porter and other pedophiles.

56.     Jane Doe 1 recalls that very soon after arriving to Fairhaven, Massachusetts, "at age six, a priest, James R. Porter, took her to the basement and forced anal sex on her." Jimmy Breslin, Chapter 7, *The Church That Forgot Christ*, Free Press, January 11, 2014, p. 79-88.

57.     Jane Doe 1 and Jane Doe 2 vividly remember bright lights and the flash of cameras blinding them after Father Porter and other pedophiles took photographs of their naked bodies. *Id.*

58.     Every Saturday and Sunday, Father Porter would take both Jane Doe 1 and Jane Doe 2 into confessional, where he would penetrate the young girls with his fingers and mandate that they perform oral sex on him; other times, Father Porter brought Jane Doe 1 and Jane Doe 2 to St. Joseph Orphanage to give other men oral sex while Father Porter watched; Father Porter called this a consequence for the girls' "bad behavior*." Id.*

59.     Jane Doe 1 vividly remembers "pain and fighting but she was held down. '[She] was always held down'" by Sisters of the Sacred Hearts and the Grey Nuns. *Id.*

60.     Many of the incidents of sexual abuse Jane Doe 1 and Jane Doe 2 were subjected to occurred at "The Monastery" (a/k/a "The Provincial House a/k/a "The Damien Residence") in Fairhaven, Massachusetts—owned and controlled by the Congregation of the Sacred Hearts of Jesus and Mary—where clergy members under the Roman Catholic Church resided and visited.

61.     Unidentified clergy members were "introduced" to Jane Doe 1 and Jane Doe 2 at "The Monastery" and permitted—*encouraged*—by Defendants' agents and employees to sexually abused Plaintiffs—both on The Monastery's premises and elsewhere, including in the State of New York.

62.     The Nuns also directly committed and furthered acts of sexual abuse and violence against Plaintiffs.

63.     Sister Ursula regularly injected Jane Doe 1 and Jane Doe 2 with Benadryl medicine to relax and sedate the girls before and after the incidents of abuse.

64.     Sister Mary Felix regularly violated Jane Doe 1 and Jane Doe 2 by shoving a crucifix into their vaginas as a form of punishment.

65.     In addition to the sexual abuse suffered by Jane Doe 1 and Jane Doe 2, they were also subjected to heinous forms of physical and mental abuse; by way of example, Mother Moffet told Jane Doe 1 and Jane Doe 2 that they "had the devil in [them]," and encouraged Sister Mary Felix and Sister Ursula to subject Jane Doe 1 and Jane Doe 2 to 200-step punishments, wherein the girls would be forced to walk 200 steps outside in the dark.

66.     Jane Doe 1 and Jane Doe 2 were also subjected to other physical punishments, such as being forced to stand outside in the cold in their pajamas until they repented for their "sins."

67.     The Nuns named herein had direct knowledge of the atrocities Jane Doe 1 and Jane Doe 2 endured, yet they directly participated in or stood by idly. In turning a blind eye, they were complicit in the cruelties that took place and conspired with Father Porter and other pedophiles to coverup child sex abuse on a systemic level.

68.     After Father Porter molested Jane Doe 1 and Jane Doe 2, the girls would not receive help or care; instead, a nun acting as Sacred Heart Academy's school nurse would "sew up the rips," referring to injuries suffered at the hand of Father Porter and his monstrous ways. *Id.*

69.     During one incident of abuse involving Andrea Randall, another boarding school student at Sacred Heart Academy, Andrea was crying, so to get her quiet, one of the Nuns smacked Andrea and bashed her head against a post, leaving her with severe injuries that led to her death. *Id.*

70.     After Andrea was murdered, Jane Doe 1 became very ill and was likely experiencing a catatonic state of shock after witnessing her dear friend's murder.

71.    The Nuns informed Jane Doe 1's family she was ill with rheumatic fever, and they transported Jane Doe 1 back to her mother's home in Brooklyn, New York, where she remained for several months to recover.

72.    Thereafter, the Nuns told Jane Doe 1's mother Jane Doe 1 needed to make-up the coursework she had missed.

73.    Jane Doe 1 was then driven from her family's home in Brooklyn, New York by the Nuns and brought to Maine, where she was left at the home of a merchant named "Ralph," who frequented St. Joseph's Orphanage as well.

74.    Jane Doe 1 was informed by the Nuns that Ralph would instruct Jane Doe 1 in the subjects she missed when she was ill.

75.    Once in Maine, Jane Doe 1 was held captive in Ralph's attic and repeatedly sexually abused by Ralph throughout the summer.

76.    Jane Doe 1 was then driven back from Maine to Sacred Heart Academy.

77.    Jane Doe 1 and Jane Doe 2 were sexually molested in the State of New York by Father Porter, the Nuns, and other pedophiles under Defendants' direction and control during the long car rides from their family's home in Brooklyn, New York back to Fairhaven, Massachusetts.

78.    Jane Doe 1 and Jane Doe 2 were also frequently taken by Father Porter and the Nuns on weekend trips throughout the Northeastern United States—including New York, Massachusetts, Connecticut, Rhode Island, Vermont, New Hampshire, and Maine.

79.    On many of these trips, Jane Doe 1 and Jane Doe 2 were subject to sexual and physical abuse.

80.    Jane Doe 1 and Jane Doe 2 specifically remember being transported to a lake house owned by a clergy member under the Roman Catholic Church in Vermont; sexual and physical abuse

occurred at this location.

81.     Jane Doe 1 and Jane Doe 2 also remember Defendants' nuns and priests brought them to a seminary in Rhode Island; sexual and physical abuse occurred at this location.

82.     Father James Porter, the Sisters of the Sacred Heart, and the Grey Nuns—educators and spiritual guides meant to protect, educate, and spiritually guide Jane Doe 1 and Jane Doe 2—injured Jane Doe 1 and Jane Doe 2 physically, spiritually, and emotionally.

83.     Defendants employed Father Porter, Father Carroll, and the Nuns as educators and spiritual guides, placing boarding students and orphans under their custody, care, and supervision.

84.     The Fall River Diocese held Sacred Heart Academy out to be a religious institution of learning, where boarding students, including minor Plaintiffs, would be safe.

85.     Defendants controlled the premises of Sacred Heart Academy and St. Joseph's Orphanage and hired and supervised the educators they assigned to the students, including Father Porter, Father Carroll, and the Nuns named herein.

86.     Defendants knew and controlled the amount of and type of time Plaintiffs spent alone with Father Porter, the Nuns, and other pedophiles—and they controlled their access to, and ability to molest Plaintiffs.

87.     The sexual offenses committed against Plaintiffs included sexual intercourse, oral sex, fondling, and forced sexual touching.

88.     The Nuns had knowledge of this abuse—evidenced by the fact they would sew up the wounds on Plaintiffs inflicted by Father Porter through his consistent abuse of them.

89.     Defendants' educators and spiritual guides participated in and covered up the sexual abuse and violence perpetuated against Plaintiffs—their knowledge, coverup, and failure to prevent continuous acts of child sex abuse is evident.

90.     During the 1960's, sexual abuse in Catholic institutions, including both churches and schools, was well known but commonly hidden from the public, parents, and parishioners.

91.     Rather than inquire as to why Father Porter was sexually abusing Jane Doe 1 and Jane Doe 2, the Nuns encouraged and participated in similar behaviors of Father Porter, and educators and spiritual guides under Defendants' direction, control, and supervision did not investigate why young children, such as Plaintiffs, were being sexually abused by the clergy members whose duty it was to act *in loco parentis* and protect Plaintiffs.

92.     Defendants are vicariously liable for the acts of Father Porter, Father Carroll, and the Nuns through the doctrine of *respondeat superior*, in addition to direct liability described here and below.

93.     Plaintiffs can show the aforementioned violations have proximately caused injuries to their person and property interests—including, but not limited to, great pain of mind and body, shock, mental anguish, emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, anger, rage, frustration, loss of enjoyment of life, loss of consortium, loss of love and affection, sexual dysfunction, past and future medical expenses for psychological treatment, therapy, and counseling, lost wages and employment opportunities, lost choses in action, and other compensation to which they were entitled.

<u>**FIRST CAUSE OF ACTION**</u>
<u>**NEGLIGENCE**</u>

94.     Plaintiffs incorporate all consistent paragraphs of this Complaint as if fully set forth under this count.

95.     The allegations of fact and law above confirm that the Defendants had a special relationship and duty to intervene and protect Plaintiffs consistent with the Restatement of Torts (Second), sec. 314 (A)(4) and sec. 320 and as more particularly described above regarding a person or entity who

has exclusive custody or control of a minor.

96.     At all relevant times herein, Defendants held their institutions out to be safe places for religious worship, spiritual development and growth, learning and education, and engaging in youth and/or community activities.

97.     At all relevant times herein, Defendants held its nuns and priests named herein to be spiritual guides and educators fit for supervising young children, like Plaintiffs.

98.     Defendants explicitly and implicitly represented to Plaintiff, their parents, and the community, that all of their educators and staff members, including Father Porter, were benevolent and trustworthy stewards of the faith who would only act in the best interests of the children whom they served and granted Father Porter unfettered access to the minor children attending the school, including Plaintiffs.

99.     Defendants had and/or assumed a duty to provide a reasonably safe environment for Plaintiffs and assumed the duty to protect and care for them.

100.    Pursuant to common law and the Restatement (Second) of Agency, § 219, Father Porter was acting as an agent of Defendant Diocese of Fall River because while engaging in the wrongful acts with Plaintiffs, Father Porter was in the course and scope of his employment acting as spiritual guide and educator of Plaintiffs and with the Fall River Diocese; and/or was able to accomplish the sexual abuse because of his job-created authority and role as an agent of the Fall River Diocese.

101.    As such, Defendants are vicariously liable for the acts of Father Porter through the doctrine of *respondeat superior,* in addition to their direct liability described here and below.

102.    Defendants knew, or should have known, that there was an unreasonable risk of harm to children in the care of Sacred Heart Academy and St. Joseph's Orphanage, to whom Father Porter

was provided access by Defendants.

103.    Defendants knew that the Catholic schools and the Roman Catholic Church generally had a long history of employees and/or agents who had sexually molested children.

104.    Defendants created a foreseeable risk of harm to Plaintiffs.

105.    As minor children being educated and boarding at Sacred Heart Academy, Plaintiffs were foreseeable victims.

106.    As minor children to whom Father Porter had access through the Diocese of Fall River's academies, orphanages, facilities, and programs, and who viewed Father Porter as a spiritual guide and educator, Plaintiffs were foreseeable victims.

107.    Defendants owed a duty of care to all minor persons, including Plaintiffs, who were likely to come within the influence or supervision of Father Porter in his role as spiritual guide, educator, employee, agent, and/or servant.

108.    Pursuant to Restatement (Second) of Torts, § 317, Defendants had a duty, as master of Father Porter, to exercise reasonable care to control Father Porter while he was acting as a spiritual guide while transporting clients to and from the State of New York, during which time sexual offenses were committed against Plaintiffs in the State of New York.

109.    The Diocese of Fall River also had a duty to exercise reasonable care to control Father Porter on premises within their control—that is, Sacred Heart Academy, St. Joseph's Orphanage, and the accompanying grounds, even when acting outside the scope of his employment, and to prevent Father Porter from intentionally harming others, including Plaintiffs.

110.    Defendants accepted responsibility for the well-being of Plaintiffs as minor children.

111.    As such, Defendants had a duty to provide the type of care required of one who requests to

be entrusted with the responsibility of caring for children.

112.    Defendants owed duties to Plaintiffs arising from the relationship akin or that of a child-parent/guardian, student-school, and/or parishioner-priest, and thus, Defendants were required and obligated to protect the children under their tutelage, including Plaintiffs.

113.    Such duties include, but are not limited to, a duty to provide safe care, custody and control of minor children, including Plaintiffs, a duty to warn of and report to the proper authorities the deviant propensities of Father Porter and the Nuns, and ultimately to prevent sexual, physical, and mental abuse of all minors within their care, control and/or custody, including Plaintiffs.

114.    Father Porter's forcible sexual acts on Plaintiffs were performed in the course and scope of his delegated duties and authority granted by Defendant Diocese of Fall River.

115.    Defendants, their agents, employees, servants and licensees, including vicariously through Father Carroll, Father Porter, and the Nuns, breached their duties of care owed to Plaintiffs; including, *inter alia:*

> a.    failing to investigate the background and/or history of Father Porter and the Nuns before placing them into close contact with minors, including Plaintiffs;
>
> b.    failing to warn Plaintiffs and their parents of sexual misconduct committed by Father Porter and the Nuns and/or the reasonably foreseeable risk of future harm, despite Defendants having actual or constructive knowledge of Father Porter and the Nuns sexually abusing children, having the propensity to sexually abuse children, and/or posing as a threat of sexual abuse to children;
>
> c.    permitting and/or directing Father Porter and the Nuns to have private contact with then minor Plaintiffs, despite having constructive or actual knowledge of Father Porter and

the Nuns sexually abusing children, having a propensity to sexually abuse children, and/or posing as a threat of sexual abuse to children;

d.      minimizing, ignoring and/or excusing the misconduct of Father Porter and the Nuns as described herein, which allowed such conduct to continue;

e.      failing to provide a safe environment to Plaintiffs within the academies, orphanages, churches, residencies, and rectories that they operated and/or owned;

f.      failing to conduct a reasonable investigation of abuse complaints;

g.      failing to create, institute, and/or enforce rules, policies, procedures, and/or regulations to identify and/or prevent the sexual abuse of children;

h.      failing to create, institute, and/or enforce rules, policies, procedures, and/or regulations to prevent Father Porter and the Nuns sexual abuse of Plaintiffs; and

i.      failing to exercise reasonable care to control Father Porter and the Nuns to prevent the sexual abuse of Plaintiffs in their custody and care, and on their premises.

116.    In the above ways, among others, Defendants failed to exercise the degree of care that a reasonably prudent person would have exercised under similar circumstances, thereby breaching their duties owed to Plaintiffs.

117.    As a direct and proximate result of the above mentioned breaches of duty by Defendants and their agents, servants,  employees  and/or others, including but not limited to Father Porter, Father Carroll, and the Nuns, for whose acts or omissions they are responsible, and those whose identities are in the exclusive control of Defendants, Plaintiffs experienced and suffered from sexual abuse at the hands of Defendants, as well as the ensuing physical, mental, and financial injuries and damages discussed herein, which Plaintiffs still suffer.

118.   As a direct and proximate result of Defendants' foregoing acts and omissions, as described herein, Plaintiffs sustained both physical and emotional injuries, including, humiliation, embarrassment, loss of self-esteem, disgrace, guilt and shame; loss of faith and mistrust of the education system, school, teachers, coaches, the Roman Catholic Church, and their agents and institutions; injuries suffered at the time of the sexual abuse including physical shock to the nervous system and emotional distress; pain and suffering; severe mental anguish and trauma, necessitating psychiatric and medical care and treatment in the past, present and/or in the future; physical ailments, including, but not limited to headaches, nausea, mental anguish, anxiety and loss of sleep; loss of earnings and earning capacity during those periods Plaintiffs were unable to work due to traumatization, and may in the future be unable to work; and grievous bodily pain and suffering, mental anguish, inconvenience, and loss of enjoyment of life, in an amount that exceeds the jurisdictional limits of all courts that may otherwise have jurisdiction.

119.   Defendants' acts and omissions were a foreseeable, direct, and proximate cause of Plaintiffs' resulting injuries and damages therefrom.

120.   By reason of the foregoing, Plaintiffs are entitled to recover all of their damages from Defendants.

## SECOND CAUSE OF ACTION
## NEGLIGENT TRAINING/SUPERVISION/RETENTION

121.   Plaintiffs incorporate all prior paragraphs of this Complaint as if fully set forth herein.

122.   Father Porter, Father Carroll, and the Nuns were employed by Defendants and were under Defendants' direct supervision, employment, and control when they committed the wrongful acts alleged herein. Father Porter and the Nuns engaged in the wrongful conduct while acting in the

course and scope of their employment with Defendants and/or accomplished the sexual abuse by virtue of their job-created authority.

123.    Defendants, through their employees and agents, had a duty arising from their employment of Father Porter and the Nuns, to ensure that they did not sexually molest and abuse children in their care and/or on their premises.

124.    Defendants owed a duty to train and educate employees and administrators and establish adequate and effective policies and procedures calculated to detect, prevent, and address inappropriate behavior and conduct between its employees and the children under their care.

125.    Defendants breached their duties to instruct, train and supervise their employees, in that Defendants failed to exercise the degree of care that a reasonably prudent person would have exercised under similar circumstances, including, *inter alia:*

    a.    failing to timely and properly educate, train, supervise, and/or monitor their agents or employees with regard to policies and procedures that should be followed when sexual abuse of a child is suspected or observed;

    b.    failing to timely and properly educate, train, supervise, and/or monitor their agents or employees with regard to policies and procedures that should be followed to detect and/or prevent sexual abuse of a child;

    c.    failing to supervise, monitor, and/or investigate Father Porter and the Nuns in their interactions with children when Defendants knew or should have known that such supervision was necessary;

    d.    failing to train employees on rules, policies, procedures, and/or regulations to prevent Father Porter and the Nuns sexual abuse of Plaintiffs;

e.      failing to properly supervise Father Porter and the Nuns such that the opportunity for repeated, unfettered private access to Plaintiffs would not be available; and

f.      failing to take reasonable steps to remove Father Porter and the Nuns from the types of duties and circumstances which allowed them the opportunity to continue sexually abusing minors, including Plaintiffs.

126.    Defendants breached their legal duty of due care owed to Plaintiffs as boarding students of Sacred Heart Academy entrusted in their care, custody, and supervision.

127.    Defendants breached their duty in failing to adequately evaluate, and qualify Father Porter and the Nuns, both pre- and post-hiring, and failed to monitor, supervise, influence, control, discipline, or discharge Father Porter and the Nuns and/or report Father Porter and the Nuns to criminal authorities and/or parents or otherwise restrict their movement and/or activities to ensure the safety of the children of Sacred Heart Academy, specifically Plaintiffs, in the ways discussed herein.

128.    Defendants and their agents and/or employees, knew, or should have known, of Father Porter and the Nuns' deviant sexual proclivities, propensities, and/or criminal misconduct prior to employing or placing Father Porter and the Nuns in positions of trust with minor.

129.    Unfortunately, Defendants placed and maintained Father Porter and the Nuns in positions of trust and control with access to children, which ultimately allowed Father Porter and the Nuns to access and harm Plaintiffs.

130.    Defendants, after placing Father Porter and the Nuns, and even with knowledge of abuse sustained by Plaintiffs, negligently retained Father Porter and the Nuns in positions where they had access to children and could foreseeably cause harm which Plaintiffs would not have been

subjected to had Defendants exercised reasonable care.

131.   In failing to timely remove Father Porter and the Nuns from working with children, Defendants failed to exercise the degree of care that a reasonably prudent person would have exercised under similar circumstances.

132.   As a direct and proximate result of the foregoing acts and omissions by Defendants, Plaintiffs sustained both physical and emotional injuries, including, humiliation,  embarrassment, loss of self-esteem, disgrace, guilt and shame; loss of faith and mistrust of the education system, school, teachers, the Roman Catholic Church and their agents and institutions; injuries suffered at the time of the sexual abuse including physical shock to the nervous system and emotional distress; pain and suffering; severe mental anguish and trauma, necessitating psychiatric and medical care and treatment in the past, present and/or in the future; physical ailments, including, but not limited to headaches, nausea, mental anguish, anxiety and loss of sleep; loss of earnings and earning capacity during those periods Plaintiffs were unable to work due to traumatization, and may in the future be unable to work; and grievous bodily pain and suffering, mental anguish, inconvenience, and loss of enjoyment of life, in an amount that exceeds the jurisdictional limits of all lower courts that may otherwise have jurisdiction.

133.   Defendants' acts and omissions were a foreseeable, direct, and proximate cause of Plaintiffs' resulting injuries and damages therefrom.

134.   By reason of the foregoing, Plaintiffs are entitled to recover all of their damages from Defendants.

## THIRD CAUSE OF ACTION
## GROSS NEGLIGENCE

135.   Plaintiffs incorporate all prior paragraphs of this Complaint as if fully set forth herein.

136.   Defendants' acts and omissions, as previously described, were committed with reckless disregard for, and with willful, wanton, and conscious indifference to, the rights, safety, and welfare of Plaintiffs and the general public.

137.   The nature of Defendants' aforesaid wrongful acts and omissions were of such a nature as to constitute gross negligence and malice.

138.   Defendants undertook a continuous course of action in the form of conscious decisions, with subjective knowledge and awareness of the risks and hazards presented by each decision as discussed above and incorporated herein, to expose Plaintiffs and others to sexual abuse and/or sexual assault by Father Porter and the Nuns, and without exercising slight care or diligence.

139.   Defendants had a duty to exercise reasonable care in relation to the safety and welfare of their minor students, including Plaintiffs.

140.   Defendants had a duty to exercise reasonable care to avoid creating or maintaining unreasonable risks to the safety and welfare of the children enrolled in their school, including Plaintiffs.

141.   Defendants had a duty to exercise reasonable care in investigating and pursuing complaints of criminal conduct, sexual misconduct, and violations of law against the children enrolled in their school, including Plaintiffs.

142.   In addition to the common law duty of ordinary care discussed above, and incorporated herein, Defendants also had a duty that arose because of, *inter alia,* a special relationship between the school and the minor students attending the school.

143.   Defendants agreed to board, educate, care for, and keep safe the minor students in exchange

for tuition, which Defendants accepted to fund and promote their school and initiatives.

144.   Defendants breached their duty of care by acting with reckless disregard of the safety and welfare of Plaintiffs and other innocent children by failing to properly investigate and report the known and tolerated pedophile activities of their educators/religious leaders, including those of Father Porter and the Nuns, and by placing its own personal interest in front of the safety of the children enrolled in their school, including Plaintiffs.

145.   Defendants were more concerned with their reputations than protecting children, including Plaintiffs. Such conduct was, and is, wanton and willful, reckless, and conscious disregard of the safety of innocent children, including Plaintiffs.

146.   Defendants' foregoing acts and omissions, involved reckless disregard of or indifference to an extreme degree of physical, mental, and psychological risk and danger, considering the probability and the magnitude of the potential harm to others.

147.   Defendants' foregoing gross negligence was a foreseeable, direct, and proximate cause of the occurrence and Plaintiffs' injuries and damages therefrom.

148.   As a direct and proximate result of the Defendants' acts and omissions, Plaintiffs suffered sexual abuse at the hands of Father Porter and the Nuns, as well as the ensuing physical, mental, and financial injuries and damages discussed herein, which Plaintiffs still continue to suffer.

149.   That by reason of the foregoing, Plaintiffs are entitled to recover all of their damages from Defendants.

150.   As a direct and proximate result of such violations, Plaintiffs suffered the injuries and damages described herein.

**FOURTH CAUSE OF ACTION**
**ASSAULT AND SEXUAL ASSAULT OF A CHILD**

151.   Plaintiffs incorporate all prior paragraphs of this Complaint as if fully set forth herein.

152.   At all relevant times, Father Porter and the Nuns were under the supervision and control of Defendants.

153.   Father Porter and the Nuns were imbued with delegated authority from Defendants, and Defendants are responsible for the sexual assault on Plaintiffs by Father Porter and the Nuns.

154.   Defendants' agents and religious leaders, Father Porter and the Nuns, engaged in assault and sexual assault of minors for which Defendants are liable.

155.   Defendants aided, abetted, and assisted before and after the fact to allow Father Porter and the Nuns to engage in such behavior, and Defendants ratified the misconduct of Father Porter and the Nuns by failing to do anything about it and covering it up thereafter.

156.   Defendants' acts and omissions were a proximate cause of Plaintiffs' injuries and damages, and by operation of law, Defendants are liable for that conduct and those damages.

**FIFTH CAUSE OF ACTION**
**PREMISES LIABILITY**

157.   Plaintiffs incorporate all prior paragraphs of this Complaint as if fully set forth herein.

158.   At all relevant times, Defendants owned and occupied the academy, orphanage, and "The Monastery," upon which many of the assaults on Plaintiffs occurred.

159.   Further, Defendants controlled the premises where Plaintiffs were assaulted.

160.   Defendants provided inadequate security and supervision over the premises despite the existence of unreasonable risk of harm from abusive personnel at the school.

161.   At all relevant times, Plaintiffs were invitees at the school premises where they were assaulted.

162.    The risk of harm was foreseeable, and Defendants knew or had reason to know that abuse of minors would occur given previous abuse, proximity of other abuse, the recency of other abuse, frequency of abuse, the similarity of other abuse, and their actual knowledge of this abuse by educators, spiritual guides, and other personnel at Roman Catholic churches, academies, orphanages, and clergy residences.

163.    The above acts and omissions by Defendants were a proximate cause of Plaintiffs' injuries and the resulting damages Plaintiffs seek in this suit.

### SIXTH CAUSE OF ACTION
### BREACH OF FIDUCIARY DUTY

164.    Plaintiffs incorporate all prior paragraphs of this Complaint as if fully set forth herein.

165.    Plaintiffs were minors at all relevant times, and Defendants and their agents and employees were acting *in loco parentis* in charge of Plaintiffs' wellbeing.

166.    At all relevant times, Plaintiffs had a special relationship with Defendants, as they were boarding school students at an academy owned, maintained, controlled, and supervised by Defendants' agents and employees.

167.    This relationship was rooted in a moral, social, religious, or personal relationship of trust and confidence between Plaintiffs and Defendants.

168.    Defendants had a dominance over Plaintiffs, who were dependent on Defendants' control and Plaintiffs reasonably relied on Defendants to act in their best interest.

169.    This special relationship gave rise to a fiduciary relationship.

170.    Further, at all relevant times, Jane Doe 1 and Jane Doe 2 had a special relationship with Defendants arising from their status as an educational and religious institution.

171.    Entrusted with special privileges and immunities, Defendants demanded complete loyalty, fealty, and trust from individuals like Jane Doe 1 and Jane Doe 2 and specifically instructed individuals like them, such that they are granted with special power to determine right and wrong.

172.    Jane Doe 1 and Jane Doe 2 were taught that they must adhere to the teachings and instructions of Defendants, and the failure to do so will result not just in discipline but also an offense against God.

173.    This extreme power imbalance mandates that individuals like Jane Doe 1 and Jane Doe 2 place an extreme degree of trust and confidence in Defendants to determine what is in the best interest of individuals like them.

174.    This psychological power over Plaintiffs caused them to justifiably and indeed mandated that they rely on the commands of Defendants, by and through their employees, educators, and spiritual leaders—including Father Porter, Father Carroll and the Nuns named herein.

175.    Given the existence of their status as fiduciaries over Jane Doe 1 and Jane Doe 2, Defendants owed them the highest duty of care at law, including but not limited to: (1) duty of loyalty and utmost good faith; (2) duty of candor; and (3) duty to act with integrity of the strictest kind; and (4) duty of full disclosure.

176.    Defendants breached their fiduciary duties by, among others, hiding and keeping secret the fact that there were persons at the school to whom Jane Doe 1 and Jane Doe 2 would be subjected that engaged in sexual abuse of minors; by failing to disclose both before and after the events at issue in this case; Defendants' knowledge of the abuse and the abuser; by failing to disclose the policy of covering-up past incidents of abuse, and putting Defendants' interests ahead of students and victims like Jane Doe 1 and Jane Doe 2.

177.    These breaches caused harm to Jane Doe 1 and Jane Doe 2 and other student victims like

them and benefitted Defendants—who sought to protect the Roman Catholic Church's reputation from public knowledge of the rampant misconduct occurring at its institutions.

178.   The above acts and omissions by Defendants were a proximate cause of Plaintiffs' injuries and the resulting damages Plaintiffs seek in this suit.

**SEVENTH CAUSE OF ACTION**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

179.   Plaintiffs incorporate all consistent paragraphs of this Complaint as if fully set forth.

180.   The sexual abuse and violence perpetuated by Father Porter and the Nuns against Plaintiffs was extreme and outrageous conduct, beyond all possible bounds of decency, atrocious and intolerable in a civilized world.

181.   Defendants' aforesaid negligent, grossly negligent and reckless misconduct endangered Plaintiffs' safety and caused Plaintiffs and other minor children to fear for their safety—especially during and after the death of Andrea Randall, which Plaintiffs witnessed.

182.   Defendants knew or disregarded the substantial probability that Father Porter and the Nuns would cause severe emotional distress to minors, including Plaintiffs.

183.   As a direct and proximate result of Defendants' misconduct, Plaintiffs suffered severe emotional distress, including psychological and emotional injury as described herein.

184.   The above acts and omissions by Defendants were a proximate cause of Plaintiffs' injuries and the resulting damages Plaintiffs seek in this suit.

**EIGHTH CAUSE OF ACTION**
**BREACH OF DUTY *IN LOCO PARENTIS***

185.   Plaintiffs incorporate all consistent paragraphs of this Complaint as if fully set forth.

186.   At all relevant times, Plaintiffs were vulnerable children and students entrusted to the care of Defendants, and they were under the supervision and control of Defendants, such that

Defendants owed them a duty to act *in loco parentis* and to prevent foreseeable injuries.

187.    By reason of the foregoing, Defendants breached their duties to act *in loco parentis*.

188.    As a direct and proximate result of Defendants' foregoing acts and/or omissions, Plaintiffs suffered injury, including the physical and psychological damages as described herein.

189.    The above acts and omissions by Defendants were a proximate cause of Plaintiffs' injuries and the resulting damages Plaintiffs seek in this suit.

<strong><u>NINTH CAUSE OF ACTION</u></strong><br><strong><u>BREACH OF STATUTORY DUTIES TO REPORT</u></strong>

190.    Plaintiffs incorporate all consistent paragraphs of this Complaint as if fully set forth.

191.    Pursuant to N.Y. Soc. Serv. Law § § 413 and 420, Defendants had a statutory duty to report reasonable suspicion of abuse of children in their care.

192.    Defendants breached their statutory duty by knowingly, willfully, and intentionally failing to report reasonable suspicion of sexual abuse by Father Porter and the Nuns.

193.    As a direct and proximate result of Defendants' foregoing acts and omissions, Plaintiffs suffered injury, including the physical and psychological damages as described herein.

## PRAYER FOR RELIEF

194.    WHEREFORE, Plaintiffs pray for the following relief against Defendants:

a.   for Plaintiffs' general and special damages in an amount to be proven at trial by jury;

b.   for Plaintiffs' incurred costs together with interest at the highest lawful rate on the total amount of all sums awarded from the date of judgment until paid;

c.   for the fair and reasonable monetary value of Plaintiff's past, present, and future pain and suffering in an amount to be proven at trial by jury;

d.   for the medical expenses incurred up to the date of trial and any additional expenses necessary for future medical care and treatment;

e.   for economic damages in the form of out-of-pocket expenses, lost wage, earnings, employment opportunities, and other economic damages;

f.   for punitive damages or exemplary damages to be set by a jury in an amount sufficient to punish Defendants for their outrageous conduct and to discourage others from engaging in similar conduct in the future;

g.   for reasonable attorneys' fees and costs, court costs, and litigation expenses;

h.   for pre-judgment and post-judgment interest pursuant to 28 U.S.C. § 1961 and any other applicable law or statute; and other litigation expenses; and

i.   for such other and further relief as this Court may deem just and proper.

## JURY DEMAND

195.    Plaintiffs demand a trial by jury on all issues so triable.

Respectfully Submitted,

*/s/ Ashley M. Pileika*
Ashley M. Pileika
New York Bar No. 974605

Darren Wolf*
Texas State Bar No. 24072430
darren@darrenwolf.com
**Law Office of Darren Wolf, P.C.**
1701 N. Market St., Suite 210
Dallas, Texas 75202
P:  214-346-5355
F:  214-346-5909
*Pro hac vice application forthcoming*