## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Jane Doe 1, an individual, Jane Doe 2, and Does 3-100,<br><br>        Plaintiffs,<br><br>v.<br><br>The Congregation of the Sacred Hearts of Jesus and Mary, Diocese of Fall River, Sisters of Charity of Montreal ("Grey Nuns"), Sisters of Charity of Quebec ("Grey Nuns"), Missionary Oblates of Mary Immaculate Eastern Province (the "Oblates"), and Black and White Corporations 1-10,<br><br>        Defendants. | **PLAINTIFFS' MEMORANDUM OF LAW IN RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS**<br><br>**1:21-cv-06865 (DLC)** |

# Table Of Contents

I.    Background ........................................................................................................5

II.   Statement of Fact ............................................................................................7

III.  Plaintiffs Have Alleged Facts Which Manifest Cognizable Causes of Action. ...............11

IV.   This Court Has Jurisdiction Over Defendants...................................................14

I.    The Court Has Long-Arm Jurisdiction ..............................................................20

   A.   Defendants Committed Tortious Activity in the State of New York CPLR §302(a)(2).............21

   B.   Defendants Transacted Business in New York CPLR § 302(a)(1) ................................25

   C.   Defendants Committed Tortious Acts in Maine, Massachusetts, Connecticut, Vermont, Rhode Island, and New Hampshire, Causing Injury to Plaintiffs CPLR § 302(a)(3)........................29

   D.   Defendants owned and used real property in New York CPLR §302(a)(4)...............................30

II.   Defendants' Due Process Rights Will Not Be Violated ......................................31

   A.   Defendants Satisfied the Minimum Contacts Requirement by Purposefully Directing Their Activities At Residents Of New York. ...............................................................................31

   B.   Maintaining This Suit In New York Does Not Offend Traditional Notions of Fair Play and Substantial Justice...............................................................................................................33

III.  New York's Statute of Limitations Applies Because Plaintiffs Were New York Residents at The Time of Their Abuse. ...............................................................35

IV.   The Child Victims Act Applies Because of the Legislative Intent to Benefit New York Survivors.......................................................................................................36

V.    The Late Addition of Defendants is not Grounds for Dismissal ......................38

VI.   Venue is Proper And New York Law Must Apply Due to................................39

Choose-of-Law and Important Policy Concerns. ........................................................39

VII.  Conclusion.......................................................................................................41

## Table of Authorities

**Cases**

*511 West 232nd Owners Corp v. Jennifer Realty*, 10 A.D.3d 573, 782 N.Y.S.2d 423 (N.Y. App.
    Div. 2004)........................................................................................................................10, 11

*Aievoli v. Farley*, 223 A.D.2d 613, 614, 636 N.Y.S.2d 833, 833 (1996).......................................27

*Bache Halsey Stuart, Inc. v. Namm*, 446 F. Supp. 692 (S.D.N.Y. 1978).......................................34

*Begley v. City of New York*, 62 A.D.3d 739, 878 N.Y.S.2d 770 (2009)........................................39

*Bianco v Flushing Hospital Medical Center*, 79 A.D.3d 777 (N.Y. App. Div. 2010).................23

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 n.18 (1985) ..............................20, 30, 31, 32

*C.Q. v. Estate of Rockefeller*, No. 20- ........................................................................................12

*Cabot Hosiery Mills, Inc., v. 7mesh Industries Inc.* 2016 WL 9526678, (D. Vt. 2016) ..............34

*Chatwal Hotels & Resorts, LLC v. Dollywood Co.*, 90 F. Supp. 3d 97, 102 (S.D.N.Y. 2015).....13

*Coffman v. Coffman*, 60 AD2d 18, 188 (N.Y. App. Div. 1977)....................................................35

*Cole v Safety-Kleen Sys., Inc.*, 189 AD3d 2168 (N.Y. App. Div. 2020).......................................28

*D & R Global Selections, S.L. v. Bodega Olegario Falcon Pineiro*, 29 N.Y.3d 292 (N.Y. Sup. Ct.
    2017)....................................................................................................................................24, 30

*Darrow v. Hetronic Deutschland*, 119 A.D.3d 1142, (N.Y. App. Div. 2014) ..............................32

*Ehrenfeld v. Mahfouz*, 489 F.3d 542, 547 (2d Cir. 2007).............................................................19

*Farrell v. The United States Olympic & Paralympic Comm.*, 567 F. Supp. 3d 378 (N.D.N.Y.
    2021).........................................................................................................................................22

*Garcia v. City of N.Y.*, 646 N.Y.S.2d 508, 509 (1st Dep't 1996)..................................................11

*Giroux v. Foley*, No. 19-CV-00187, 2020 WL 1677073, at *4 (D. Vt. Apr. 6, 2020).................31

*Guggenheimer v. Ginzburg*, 43 N.Y.2d 268  (N.Y. 1977). .........................................................10

*Guggenheimer v. Ginzburg*, 43 N.Y.2d 268 (N.Y. 1977). ............................................................10

*Hoose v. Drumm*, 281 N.Y. 54, 57–58 (1939) ............................................................................11

*Ingraham v Carroll*, 90 NY2d 592, 596-597, (N.Y. 1997) ........................................................28

*Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). ..........................................................30

*Janklow v Williams*, 43 Misc 2d 1053 (N.Y. Sup Ct. 1964) ......................................................24

*Jensen v. General Elec. Co.*, 82 NY2d 77 (N.Y. 1993) ..............................................................36

*Lamarca v. Pak-Mor Manufacturing Company*, 95 N.Y.2d 210 (N.Y. 2000) ............................33

*Lewis v. Fresne*, 252 F.3d 352, 359 (5th Cir. 2001) ...................................................................21

*Loughry v. Lincoln First Bank*, 67 N.Y.2d 369 (N.Y. 1986) ......................................................23

*McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957) .............................................................31

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.* 84 F.3d 560 (2d Cir. 1996)................................34

*Nonnon v. City of New York*, 9 N.Y.3d 825, (N.Y. 2007) ...........................................................40

*PC-41 Doe v. Poly Prep Country Day Sch.*, 20-CV-03628, 2021 WL 4310891, at *12 (E.D.N.Y.

Sept. 22, 2021)........................................................................................................................11

*Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, (N.Y. App. Div. 2016) ..........................................24, 26

*Russell v Westchester Community Coll.*, 2017 US Dist LEXIS 159540, at *1 (SDNY Sep. 27,

2017, No. 16-CV-1712 .......................................................................................................10, 11

*Russell v Westchester Community Coll.*, 2017 US Dist LEXIS 159540, at *1 (SDNY Sep. 27,

2017, No. 16-CV-1712)............................................................................................................10

*S.H. v. Diocese of Brooklyn*, 2020 N.Y. Slip Op. 32648(U), (Sup. Ct. N.Y., August 4, 2020,

Silver, J.), affirmed 205 A.D.3d 180 .......................................................................................36

*See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013) .......14

*Shapiro v Syracuse University et al*. 2022 NY Slip Op 04835 (N.Y. App. Div. 2022) ..........34, 36

*Shepherd v. Annucci*, 921 F.3d 89, 95 (2d Cir. 2019) .................................................................14

*Totaltape v. National Assoc. of State Bds. of Accountancy et al.*, 85 Civ. 4241 (S.D.N.Y. Mar. 4, 1987) ...............................................................................................................................................37

*Travelers Health Assn. v Virginia*, 339 US 643 (1950) ..................................................................31

*Viada v Osaka Health Spa, Inc.*, 235 FRD 55 (SDNY 2005) ........................................................37

*Wolloch v. Synagogue.* 950017/2021 **(**Sup. Ct. N.Y., Aug. 18, 2022) ...........................................37

*Wurtenberger v. Cunard Line, Ltd.*, 370 F Supp 342 (S.D.N.Y. 1974) ........................................25

*Yablon v. Dental Excellence of Blue Bell*, No. 07 CIV. 11040 (DLC), 2008 WL 11516565, at *4 (S.D.N.Y. Mar. 24, 2008) ............................................................................................................30

*Zimmerman v. Poly Prep Country Day Sch.*, 888 F. Supp. 2d 317, 335 (E.D.N.Y. 2012) .....11, 12

## Statutes

28 U.S. Code § 1391(b) ....................................................................................................................39

CPLR § 302(a)(1) .............................................................................................................................24

CPLR § 302(a)(3) .............................................................................................................................29

CPLR §302(a)(2) ..............................................................................................................................21

CPLR §302(a)(4) ..............................................................................................................................30

CPLR 202 ..........................................................................................................................................35

CPLR 302(a) .....................................................................................................................................20

CPLR 302(a)(1) ...........................................................................................................................24, 27

Fed. R. Civ. P. 12(b)(2) ...............................................................................................................14, 15

Fed. R. Civ. P. 12(b)(6) ...............................................................................................................11, 13

Me. Rev. Stat. tit. 14, § 752-C .........................................................................................................38

## I.      __Background__

For six years, Jane Doe 1 and Jane Doe 2 were taken to and from their home in Brooklyn, New York and sexually abused at locations throughout New York by priests under the Fall River Diocese, the Congregation of the Sacred Hearts, and the Oblates. Nuns under the Congregation of the Sacred Hearts, the Grey Nuns of Montreal, and the Grey Nuns of Quebec also took part in incidents of sexual abuse in New York and transported Jane Doe 1 and Jane Doe 2 to/from New York. Together, priests and nuns under Defendants' direction, control, and employ also covered up horrific acts of child sexual abuse perpetrated against Jane Doe 1 and Jane Doe 2, making it possible for serial predators, like Father John Porter, to "hide behind their robes."

In addition to locations in New York, Plaintiffs were also sexually abused at locations outside the State of New York. Unfortunately, as recent cases evidence, predators do not typically confine their sexual abuse to one State. If predators have targeted and sexually abused children in New York, it is plausible they have committed sexual abuse in other States.

Defendants do not dispute the horrific acts of sexual abuse detailed in the FAC were perpetrated against Jane Doe 1 and Jane Doe 2. And Defendants do not dispute the photographs of Jane Doe 1 and Jane Doe 2 were taken at schools, seminaries, and residences owned and controlled by entities under the Roman Catholic Church. Instead, they raise jurisdictional defenses, point fingers at one another, and claim Plaintiffs' injuries are time-barred. The Oblates and Grey Nuns of Quebec bemoan a grave miscarriage of justice has been committed against them because they were added on April 21, 2022. Plaintiffs have suffered silently for nearly seven decades—during

which time, Defendants have had knowledge and control over the predators and information pertinent to their sexual abuse.

Despite the reasons Defendants have crafted to detract from the crux of this case, the only grave miscarriage of justice is the rampant sexual abuse perpetrated against Jane Doe 1 and Jane Doe 2. And the only deficiency in Plaintiffs' FAC is the unfortunate likelihood additional priests and nuns responsible for the sexual violence perpetrated against Plaintiffs remain unidentified.

A picture is worth a thousand words—and there are many in Plaintiffs' FAC. These photographs depict two New York minors, Jane Doe 1 and Jane Doe 2, sexually abused at locations throughout New York. Additionally, they depict two New York minors being transported to/from their home in New York, pursuant to a contract between Plaintiffs' mother and the Fall River Diocese and the Congregation of Sacred Hearts—which the Oblates and the Grey Nuns of Montreal and Quebec were third party beneficiaries of.

A close read of Defendants' motions to dismiss and exhibits attached thereto show they have all but conceded priests and nuns under the Roman Catholic Church were responsible for years of rampant and horrific sexual abuse committed against Plaintiffs. Yet Defendants seemingly argue because Plaintiffs were also sexually abused by their employees and agents at locations in Maine, Massachusetts, Connecticut, Vermont, and Rhode Island, they are *less* responsible for the six years of sexual abuse and conspiracy to commit sexual abuse perpetrated against Jane Doe 1 and Jane Doe 2 in New York.

The discovery process is designed to, and does, shed light on which "bad priests"[1] and nuns were involved in incidents of sexual abuse—to date, this information remains in Defendants' sole possession, knowledge, and control.[2]

This point bears repeating, priests and nuns under the control, employ, and direction of the Fall River Diocese, the Congregation of Sacred Hearts, the Oblates, and the Grey Nuns of Montreal and Quebec sexually abused, transported to/from, and conspired to cover up rampant acts of sexual abuse committed against Jane Doe 1 and Jane Doe 2 ***in the state of New York*** for approximately six years.

Plaintiffs respectfully ask the Court deny Defendants' motions to dismiss and afford them a fair and full opportunity to obtain discovery in this case.

## II.    Statement of Fact

Plaintiffs Jane Doe 1 and Jane Doe 2 (together referred to as "Plaintiffs"), were subjected to hundreds of sexual offenses—including rape, forced oral sex, and fondling—while elementary-aged boarding school students. FAC at ¶ 1. Jane Doe 1 was six years old when the abuse began in 1964, and Jane Doe 2 was five years old; the abuse continued until Plaintiffs were removed from Sacred Hearts Academy in 1970 at twelve and eleven years old. Unimaginable horrors consumed their childhoods. FAC at ¶ 2.

---

[1] *See Guerriero vs. Diocese of Brooklyn, et al*., 21-cv-04923-MKB-JRC (E.D.N.Y.), dkt. # 52.

[2] Despite counsel for Plaintiffs meeting and conferring with counsel for the Fall River Diocese months before filing the Complaint in August 2021, counsel for Defendants have refused to affirmatively identify the Sacred Hearts nuns responsible for staffing Sacred Hearts Academy; and the Grey Nuns of Montreal and the Grey Nuns of Quebec have identified the other entity as the "Grey Nuns" responsible for Plaintiffs' sexual abuse. Counsel for the Grey Nuns of Quebec have gone so far as to threaten to file sanctions against Plaintiffs' counsel.

The events described herein shock the conscience; sexual abuse of children can only occur on this systemic level due to the intentional ratification, coverup, and participation by Defendants' superior officers. FAC at ¶ 4.

Jane Doe 1 and Jane Doe 2 were born in Brooklyn, New York to a tightknit family of Cuban immigrants. FAC at ¶ 34. Although Plaintiffs' family did not come from great financial means, they were surrounded by love and support during their first years of life in New York. FAC at ¶ 35. Plaintiffs recall many happy memories from their early childhood—celebrating holidays, gathering for family events, and spending time at the park with their mother. FAC at ¶ 36. Plaintiffs' mother adamantly believed in investing in her daughters' education, and she did everything in her power to send Jane Doe 1 and Jane Doe 2 to the best schools possible. FAC at ¶ 37. Before attending Sacred Hearts Academy, Jane Doe 1 and Jane Doe 2 attended St. Vincent De Paul—a Catholic school in Tarrytown, New York—for one year. FAC at ¶ 38.

When Plaintiffs' mother received promotional material from the Fall River Diocese that boasted of one of its boarding schools and promised to provide a homelike atmosphere, rigorous academics and promised to impart students with dignity and high ideals, she was convinced her daughters would receive an elite Catholic education. FAC at ¶ 39. Consequently, Plaintiffs' mother removed her daughters from St. Vincent De Paul and enrolled them in Sacred Hearts Academy in Fairhaven, Massachusetts, trusting that they would be nurtured and protected by Defendants' spiritual guides and educators. FAC at ¶ 40.

Then, in the Fall of 1964, clergy members came to Plaintiffs' Brooklyn home and took them into Massachusetts where their childhoods would be violently stripped from them forever. FAC at ¶ 41.

The two little girls arrived at the boarding house, far away from home. They were nervous, but they knew they had each other. They were immediately introduced to the staff and leadership at Sacred Hearts Academy. Plaintiffs met the head priest, Father Carroll, and another priest named Father Porter. Father Porter lived just up the street and was helping Father Carroll perform mass and confessionals. FAC at ¶ 69-70. In the girls' eyes, these two men were as close to God as one could be. Little did Plaintiffs know, however, that Porter was a vicious rapist who would later confess to molesting over 100 young boys and girls, and Carroll was his enabler. FAC at ¶ 69.

Soon after arriving at Sacred Hearts Academy, Porter took six-year-old Jan Doe 1 into the basement of the residence. This was the first time she was anally raped. FAC at ¶ 73; FAC n. 17. Over time, Plaintiffs were pulled into this basement hundreds of times for unspeakable reasons. They got used to the bright lights, the cameras, and the faces of strange men as they watched and partook in the violation of the girls' bodies. FAC at ¶ 74; FAC n. 18. Unfortunately, Sacred Hearts was one of many houses of horror.

On the weekends, Father Porter and other priests of the Roman Catholic Bishop of Fall River ("Fall River Diocese") and the Congregation of the Sacred Hearts—United States Province ("Congregation of the Sacred Hearts"), including Frederick Fury and Raymond Mahoney, regularly brought Jane Doe 1 and Jane Doe 2 to St. Joseph Orphanage, The Provincial House, and other New York and Maine locations so they could be further trafficked and abused. FAC at ¶ 86.

Other weekends, Sacred Heart Sisters (nuns from the Congregation of the Sacred Hearts), Grey Nuns of Quebec, and Grey Nuns of Montreal oversaw the exploitation of the girls. These nuns took Plaintiffs to The Missionary Oblates of Mary Immaculate Eastern Province ("Oblates") Seminary and Mission Houses in Essex, New York and Newburg, New York. FAC at ¶¶ 44, 53. The sisters/nuns gave the girls to Oblate priests including Father Arthur Craig, who forced oral sex

and raped them. FAC at ¶ 50. This happened at the Essex, New York location at least ten times. FAC at ¶¶ 44.

The two young girls were also taken by Sacred Hearts Nuns and Grey Nuns of Quebec and Montreal to an Oblate Seminary in Bucksport, Maine approximately five to ten times. FAC at ¶ 57.  Father Alphonse Breault was one of the predators in Bucksport; he would try to act "fatherly" towards the girls and take them on one-on-one walks outside around the premises. FAC at ¶ 58.

When then ten-year-old Jane Doe 1 saw Alphonse Breault take Jane Doe 2 alone, she would often try to protect her nine-year-old sister by taking her spot. Once Breault got a child alone on the Maine Oblate property, he would grip her head and force her to perform oral sex. FAC at ¶ 58.

Jane Doe 1 estimates she and Jane Doe 2, were taken to 30 to 40 different locations to be sexually abused by dozens of adults. FAC at ¶ 61.

 In addition to hand delivering Jane Doe 1 and Jane Doe 2 to pedophile priests, Grey Nuns of Montreal and Quebec and Sacred Hearts Sisters also committed atrocities themselves. In fits of spontaneous rage, Sister Mary Felix used to shove crucifixes into Plaintiffs' vaginas causing vaginal tearing. FAC at ¶ 89. Sometimes, Sacred Hearts Sister, Sister Ursula injected Jane Doe 1 and Jane Doe 2 with Benadryl to sedate the girls before and after abuse. FAC at ¶ 88.

Sacred Heart Sisters, Grey Nuns of Quebec, and Grey Nuns of Montreal held the Plaintiffs down as they were getting raped by various priests and clergy members. FAC at ¶ 77. The girls kicked and screamed but were too small to escape their hold. The nuns and priests continuously reminded Plaintiffs that the abuse was a consequence of unidentified 'sinful behaviors.' They had to submit to the priest because they were inherently 'bad.' FAC at ¶ 75. Occasionally the abusers would reason that Plaintiffs' working-class mother submitted late tuition payments and the little girls had to 'pay' somehow. FAC at ¶ 78.

After years of experiencing and witnessing the unthinkable, Jane Doe 1 fell into a catatonic state. FAC at ¶ 95. Sacred Heart Academy nuns informed Jane Doe 1's family she was ill with rheumatic fever, and they transported Jane Doe 1 back to her mother's home in Brooklyn, New York, where she remained for several months to recover. FAC at ¶ 96. Thereafter, the nuns told Jane Doe 1's mother Jane Doe 1 needed to make-up the coursework she had missed. FAC at ¶ 97.

Jane Doe 1 was then driven from her family's home in Brooklyn, New York by the nuns and brought to Maine, where she was left at the home of a merchant named "Ralph," who frequented St. Joseph's Orphanage as well. Once in Maine, Jane Doe 1 was held captive in Ralph's attic and repeatedly sexually abused by Ralph throughout the summer. Come Fall, she was sent back to Massachusetts for the start of another horrific school year. FAC at ¶¶ 98-100.

The head priest, Father William Carroll of The Congregation of the Sacred Hearts knew Plaintiffs were being horribly sexually abused by Father Porter and the other predatory clergy named herein. On the Mondays following these dreadful weekends, Carroll summoned the nuns and a local doctor to provide medical care, including vaginal and rectal suturing. Then, given less than 24 hours to heal, the new week of hell would begin. FAC at ¶¶ 84-85.

### III.   Plaintiffs Have Alleged Facts Which Manifest Cognizable Causes of Action.

Defendants' motions to dismiss must be denied because Plaintiffs' Amended Summons and Complaint (FAC) alleges facts which support each element of Plaintiffs' claims. The facts establish Defendants' (1) negligence, (2) gross negligence, (3) negligent supervision/ retention/hiring, (4) premises liability, and (5) breach of fiduciary duty.

The Court's role is to determine only "whether the pleading states a cause of action, and if from its four corners factual allegations are discerned which taken together manifest any cause of

action cognizable at law a motion for dismissal will fail." *Guggenheimer v. Ginzburg*, 43 N.Y.2d 268 (N.Y. 1977).

When ruling on a defendant's motion to dismiss, "a judge must accept as true all of the factual allegations contained in the complaint. In addressing the sufficiency of a complaint courts accept as true all factual allegations. In reviewing a dismissal pursuant to Fed. R. Civ. P. 12(b)(6), a court should accept all factual allegations in the complaint as true. Further, for the purpose of resolving a motion to dismiss, the court draws all reasonable inferences" in favor of the plaintiff. *Russell v Westchester Community Coll.*, 2017 US Dist LEXIS 159540, at *1 (SDNY Sep. 27, 2017, No. 16-CV-1712). See also, *511 West 232nd Owners Corp v. Jennifer Realty*, 10 A.D.3d 573, 782 N.Y.S.2d 423 (N.Y. App. Div. 2004); *Palladino v. CNY Centro, Inc.*, 70 A.D.3d 1450, (N.Y. App. Div.

Further, for the purpose of resolving a motion to dismiss, the court draws all reasonable inferences" in favor of the plaintiff. *Russell v Westchester Community Coll.*, 2017 US Dist LEXIS 159540, at *1 (SDNY Sep. 27, 2017, No. 16-CV-1712). See also, *511 West 232nd Owners Corp v. Jennifer Realty*, 10 A.D.3d 573, 782 N.Y.S.2d 423 (N.Y. App. Div. 2004); *Palladino v. CNY Centro, Inc.*, 70 A.D.3d 1450, (N.Y. App. Div. 2010).

A school and its educators owe students a duty to "exercise such care of them as a parent of ordinary prudence would observe in comparable circumstances." *Zimmerman v. Poly Prep Country Day Sch.*, 888 F. Supp. 2d 317, 335 (E.D.N.Y. 2012) (quoting *Hoose v. Drumm*, 281 N.Y. 54, 57–58 (1939)); see also *Garcia v. City of N.Y.*, 646 N.Y.S.2d 508, 509 (1st Dep't 1996) ("This duty [of care] derives from the fact that the school, once it takes over physical custody and control of the children, effectively takes the place of their parents and guardians"). It is well settled that "[i]n New York, schools are under a special duty of in loco parentis," *PC-41 Doe v. Poly Prep*

*Country Day Sch.*, 20-CV-03628, 2021 WL 4310891, at *12 (E.D.N.Y. Sept. 22, 2021). Each of the five Defendants, therefore, maintained a "special relationship" with Plaintiffs and a duty to act in loco parentis.

Here, Plaintiffs clearly alleged the facts manifesting Defendants' duties (fiduciary and in loco parentis) to Plaintiffs. FAC ¶¶ 116-118, 147-148, 182. Further, as stated in Plaintiffs' FAC, each of the named Defendants breached said duty when they either participated in or facilitated the sexual abuse of the girls. FAC at ¶¶ 122, 137, 149-151. Plaintiffs specifically pled the ways in which Defendants knowingly harmed the very same individuals whom they had a duty to protect. Once accepted as true, these allegations form cognizable causes of action and are not subject to dismissal under FRCP (12)(b)(6).

A factfinder can also plausibly conclude that Defendants were only able to continue sexually abusing Plaintiffs for years because many of Defendants' agents and employees deliberately turned a blind eye, covered up, and/or condoned the incidents of abuse. This "smack[s] of intentional wrongdoing" and "evince[s] a reckless disregard to the rights of others" by the five Defendants—constituting gross negligence. *C.Q. v. Estate of Rockefeller*, No. 20-CV-2205, 2021 WL 4942802, at *8 (quoting *Am. Tel. & Tel. Co. v. City of New York*, 83 F.3d 549, 556 (2d Cir. 1996)). Accordingly, Plaintiffs' negligence and gross negligence claims prevail.

In addition, under New York law, plaintiffs can sue an employer for negligent retention or supervision if the employer "'knew or should have known' of [the employee's] 'propensity for the conduct which caused [their] injury.'" *Zimmerman v. Poly Prep Country Day Sch.*, 888 F. Supp. 2d 317, 335 (E.D.N.Y. 2012) (quoting *Bumpus v. New York City Transit Auth.*, 851 N.Y.S.2d 591, 591–92 (2d Dep't 2008)). "[I]n addition to the standard elements of negligence," a plaintiff alleging negligent hiring, retention, supervision, and direction must show: "(1) that the tort-feasor

and the defendant were in an employee-employer relationship; (2) that the employer 'knew or should have known of the employee's propensity for the conduct which caused the injury' prior to the injury's occurrence; and (3) that the tort was committed on the employer's premises or with the employer's chattels." *Poly Prep*, 2021 WL 4310891, at \*11 (citations omitted); see also *Kenneth R. v. Roman Catholic Diocese of Brooklyn*, 654 N.Y.S.2d 791 (2d Dept 1997)).

In addition to the standard negligent elements, discussed supra, Plaintiffs have alleged (1) each of their abusers were supervised, controlled, and employed by one or more of the named Defendants, *see, e.g.*, FAC ¶ 145; (2) at a minimum, Defendants' priests, nuns, employees, and agents were on notice of the named abusers' sexual propensities and/or acts of child sexual abuse, listed *supra*, and (3) the incidents of abuse occurred in rectories, schools, and residences operated by Defendants, s*ee, e.g., id.* at ¶¶ 23, 30, 54, 76, 86.

Notably, it is defendant-movant who has the burden to demonstrate that, based upon the four corners of the complaint liberally construed, the pleading states no legally cognizable cause of action. *Leon v. Martinez*, 84 N.Y.2d 83 (N.Y. 1994).

## IV.    This Court Has Jurisdiction Over Defendants.

Plaintiffs' sufficient allegations of jurisdiction must defeat all pre-answer, pre-discovery Fed. R. Civ. P. 12(b)(2) motions to dismiss on jurisdictional grounds. The case at bar is in its pre-discovery phase and to dismiss on jurisdictional grounds would be highly premature.

Defendants' motions to dismiss Plaintiffs' FAC pursuant to FRCP 12(b)(2) should be denied in their entirety; this Court has jurisdiction over all five named Defendants in this case.[3] A

---

[3] Four Defendants—the Fall River Diocese, Congregation of the Sacred Hearts, Grey Nuns of Montreal, and the Grey Nuns of Quebec filed motions to dismiss pursuant to 12(b)(2). The Oblates did not file a motion to dismiss pursuant to 12(b)(2), presumably conceding this Court exercises general and specific personal jurisdiction over the Oblates given their properties and presence in New York.

"plaintiff's burden of proof" with regard to personal jurisdiction "'depends upon the procedural context in which the jurisdictional challenge in raised.'" *Chatwal Hotels & Resorts, LLC v. Dollywood Co.*, 90 F. Supp. 3d 97, 102 (S.D.N.Y. 2015) (citation omitted).

At this early juncture, "a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith, legally sufficient allegations of jurisdiction. At that preliminary stage, the plaintiff's prima facie showing may be established solely by allegations." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84-85 (2d Cir. 2013).

In addition, because Defendants move to dismiss for lack of personal jurisdiction, the Court may also consider evidence outside of the Complaint, including affidavits submitted by the parties. A "motion to dismiss pursuant to Rule 12(b)(2) based on lack of personal jurisdiction is 'inherently a matter requiring the resolution of factual issues outside of the pleadings," therefore, "all pertinent documentation submitted by the parties may be considered in deciding the motion.'" *Romero v. 88 Acres Foods, Inc.*, 580 F. Supp. 3d 9, 14 (S.D.N.Y. 2022). *Giroux v. Foley*, Case No. 19-cv-00187, 2020 WL 1677073 (D. Vt. Apr. 6, 2020), Citing *Shepherd v. Annucci*, 921 F.3d 89, 95 (2d Cir. 2019) (holding the court may consider "evidence outside the pleadings [ ]" under "Rule 12(b)(2)."

The Court must then construe the supporting materials in the light most favorable to the plaintiff. *See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013); *see also Allen v. Federal Express Corporation*, 1:09CV17 (M.D.N.C. Mar. 31, 2011) (quoting *Hoffritz for Cutlery, Inc.,* 763 F.2d at 57 [2nd Cir. 1985]) ("'[A]ll pleadings and affidavits are construed in the light most favorable to the plaintiff,' and all inferences are drawn in the plaintiff's favor.").

Here, preliminary investigations have shown evidence that each of the five named Defendants were involved in the abuse of the Plaintiffs:

1. The Fall River Diocese staffed, managed, advertised, and funded both St. Joseph's Orphanage and School and Sacred Hearts Academy. The Fall River Diocese also trained and hired the nuns and priests who abused Plaintiffs. The image below is the Official Catholic Directory of 1964 chapter on the Diocese of Fall River (p. 446).



Below is a zoomed in image of the above, showing that Sacred Heart Academy and St. Joseph's school, upon information and belief, were under the control and direction of the Fall River Diocese:

Harding rd. Boys 47. Girls 55.
Sacred Hearts, Rev. Alexis C. Wygers, SS.CC., Administrator.
Res., 382 Main st., 02719.
*School*—3 Sisters of the Sacred Hearts. 334 Main st. 1 Lay Teacher. Pupils: Boys 66; Girls 50.

Res., E. Falmouth, 02536.
Fairhaven, Bristol Co., St. Joseph's, Revs. Columba Moran, SS.CC., Administrator; Joachim Shults, SS.CC., John F. Sullivan, SS.CC., John Caton, SS.CC.
Res., 3 Adams st., 02719.
*School*—6 Sisters of the Sacred Hearts. 2 Lay Teachers. 334 Main st. Pupils: Boys 169; Girls 187.
St. Mary's Boys William J. Dillon SS.CC

2.  According to their website, the Oblates operated St. Joseph's Orphanage and School and have been present in Lowell, Massachusetts for over 150 years.



**150 years in Lowell, Massachusetts**

On May 3, the Missionary Oblates of Mary Immaculate at *St. Joseph the Worker Shrine* in Lowell, Massachusetts commemorated the 150th Anniversary of their first Mass in the city.

On October 14, the formal celebration of the sesquicentennial is slated to occur. The revered chalice of founding Oblate Fr. André Garin, ordinarily displayed at the *Oblate Heritage Museum*, is featured in those liturgical celebrations underlining the continuity of Oblate ministry in Lowell – and still emanating from this historic original venue.

17

3.  Per the 1955 *Guide to the Catholic Sisterhoods of the United States* (McCarthy,

    Tomas P.), The Grey Nuns of Montreal maintained their U.S. administrative offices

    in Cambridge, Massachusetts. *See* image below.



4.  *The Anchor,* a publication by Fall River Diocese, featured an article on August 13th,

    2010, confirming that the Grey Nuns of Quebec first arrived in Fall River in 1891 to

    staff St. Joseph's Orphanage.



**DIOCESE OF FALL RIVER**

# Sisters of Charity of Quebec to leave after 119 years of service

BY DEACON JAMES N. DUNBAR

NEW BEDFORD—When Sisters Gilberte Masson and Monique Lesage of the Sisters of Charity of Quebec return to the motherhouse in Canada in September, they will leave behind a rich heritage of dedicated service to orphans and the aged and infirm that began in 1891 when their congregation arrived in the Fall River Diocese.

The first of the "Grey Nuns," arrived in what is now the Diocese of Fall River in 1891, staffing St. Joseph's Orphanage in Fall River.

"We are the last of many Sisters of Charity of Quebec who before us worked at the Sacred Heart Home on Summer Street in the 93 years since the first contingent came to the home in 1917," said Sister Masson. For Sister Monique and me, there is a lot of emotion. We will miss those we served and worked with."

Sister Monique is 74, "and I will be 81 next week," reported Sister Masson.

"I was at Mount St. Joseph School in Fall River when it closed in 1986, and I was assigned to the Sacred Heart Home. There was a total of 24 of us Sisters serving at the home at the time, and we numbered more during some years, but the numbers have dwindled," she added.

Turn to page 18



5. *The Anchor* also featured an article on February 2nd, 1969, honoring the Sacred Hearts Sisters who staffed Sacred Hearts Academy. See below. On August 2nd, 2008, *South Coast Today*, a Massachusetts-based newspaper, published an article (linked here) explaining that Sacred Hearts Sisters and priests used to transfer students between Sacred Hearts Academy and St. Joseph's School. *See* below.

**ST. JOSEPH, FAIRHAVEN**

The Association of the Sacred Hearts will sponsor a tea at 5 Sunday night, Feb. 9 in the school hall in honor of the Sisters of the Sacred Hearts who staff the parish school. All parish women are invited. A penny sale will be featured.

Association members are reminded to attend Mass tomorrow, the First Friday. There will be a 7 o'clock evening Mass in addition to the morning Masses.

In the present filing, Plaintiffs are offering compelling evidence that support sufficient jurisdictional allegations to show the need for discovery so that all parties may come to an understanding of the truth.

## I.      The Court Has Long-Arm Jurisdiction

In resolving a question of specific personal jurisdiction in a diversity action, the Court looks to the forum state's long-arm statute before assessing whether jurisdiction comports with due process requirements. *See, e.g.*, *Ehrenfeld v. Mahfouz*, 489 F.3d 542, 547 (2d Cir. 2007). The Court has properly exercised its long-arm jurisdiction in accordance with CPLR 302(a).

Pursuant to CPLR 302(a), Plaintiffs can exercise long-arm jurisdiction over a defendant when:

1. Defendants transacted business within the state of New York and contracted to supply services in the state of New York
2. Defendants committed tortious acts within the state of New York
3. Defendants committed tortious acts without the state of New York causing injury to person within the state of New York
   a. (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or

b.  (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; or

4.  Defendants owned, used, and possessed real property situated within the state of New York.

Plaintiff will demonstrate in the following subsections that this Court has personal jurisdiction over each of the five Defendants.

## A.  Defendants Committed Tortious Activity in the State of New York CPLR §302(a)(2)

CPLR 302(a)(2) permits personal jurisdiction because there was abuse in Newberg and Essex, New York on dozens of occasions. All five Defendants were directly involved in the sexual abuse of Plaintiffs that occurred in New York when they transferred the girls to various properties in New York—knowing exactly what was going to happen to them. Priests associated with the Congregation of Sacred Hearts, Oblates, and Fall River Diocese committed the abuses themselves after intentionally directing that the young girls be brought to them to/from Massachusetts and New York.

Even one tortious act committed in the State of New York supports jurisdiction "so long as 'it creates a substantial connection with the forum' based on the 'nature and quality and the circumstances of [its] commission[.]'" *Giroux v. Foley*, No. 19-CV-00187, 2020 WL 1677073, at 4 (D. Vt. Apr. 6, 2020) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 n.18 (1985)) (internal quotation marks omitted).

In *Giroux v. Foley*, a citizen of the State of New Jersey filed suit against a citizen of the State of Kansas, alleging the defendant took him to Vermont in 1984, when the plaintiff was fifteen years old, and sexually assaulted him in a hotel room. *Giroux,* 2020 WL at 2. The plaintiff asserted the defendant groomed him by taking him on trips by car, bus, and both private and commercial airplane in Vermont, Kansas, Missouri, Florida, Oklahoma, Colorado, Tennessee, and Canada;

21

and by paying for hotels, restaurants, meals, entertainment, and other miscellaneous expenses. *Id.* at 2.

The *Giroux* court denied the defendant's motion to dismiss for lack of personal jurisdiction explaining, when a "single act alleged is an intentional tort that gives rise to the plaintiff's cause of action, that tort alone 'may support the exercise of personal jurisdiction over the nonresident defendant who has no other contacts with the forum.'" *Id.* at 6. (citing *Licciardello v. Lovelady*, 544 F.3d 1280, 1285 (11th Cir. 2008); *see also Lewis v. Fresne*, 252 F.3d 352, 359 (5th Cir. 2001) (finding that a single phone call with the forum state constituted sufficient minimum contacts because the defendants allegedly "intentionally defrauded" the plaintiff in that communication). The *Giroux* court further reasoned, "[i]n this case, far from de minimis, the single act constituting [d]efendant's contact with Vermont is alleged to be an intentional tort with a minor victim that involved both planning and purposeful availment of facilities in Vermont. Accepting the facts pled in the Complaint as true and crediting [p]laintiff's affidavit, the 'intentional conduct by [defendant] . . . creates the necessary contacts with the forum' . . . [t]he first prong of the personal jurisdiction test is therefore satisfied." *Id.* at 7.

Here, Plaintiffs have alleged Defendants committed multiple acts of child sexual abuse at locations throughout the State of New York over the course of approximately six years. Specifically—priests associated with the Sacred Heart, Oblates, and Fall River Diocese committed the abuses themselves after intentionally directing that the young girls be brought to them out of Massachusetts and into New York. All five Defendants were directly involved in the sexual abuse of Plaintiffs that occurred in New York when they transferred the girls to various properties in New York—knowing exactly what was going to happen to them. *See* FAC ¶¶ 22-23, 28, 30; Jane Doe 1 Declaration, attached hereto.

In *Farrell v. Unites States Olympic & Paralympic Comm.*, a former Olympic speedskater filed suit against several entities—the U.S. Olympic & Paralympic Committee, U.S. Speedskating, the U.S. Olympic Education Center, and the Saratoga Winter Club—for negligence, assault and battery, negligent infliction of emotional distress, and intentional infliction of emotional distress pursuant to New York's Child Victims Act ("CVA"). *Farrell v. The United States Olympic & Paralympic Comm.*, 567 F. Supp. 3d 378 (N.D.N.Y. 2021). The plaintiff alleged her former teammate and mentor, who was then a 33-year-old Olympian speedskater, sexually abused her when she was 15 years old, over a period of seven months while training for the 1998 Winter Olympics. *Id.* The sexual abuse commenced after her mentor/assailant began grooming her by devoting attention to her, offering her assistance, confiding in her, giving her gifts, endearing himself to her parents, and driving her to and from speedskating training and practice sessions at least three days per week. *Id.* Similar to Jane Doe 1 and Jane Doe 2, the plaintiff in *Farrell* "dreaded when [her mentor/assailant] would transport her because 'she never knew if he was taking her to skate or to his home to molest her.'" *Id.* at 383. The sexual abuse occurred at various Olympic training centers in New York and Michigan, in addition to the mentor/assailant's home, vehicle, and in other secluded locations. *Id.*

One of the defendants, U.S. Speedskating, alleged a New York court could not exercise jurisdiction over it because it was incorporated and headquartered outside New York and the plaintiff's mentor/assailant was not acting as its agent, as the entity never employed or entered into any written contracts with him. The plaintiff argued her mentor/assailant was acting as the entity's agent because, periodically, he was recognized by U.S. Speedskating in an official capacity as an athlete representative. Further, the plaintiff pointed to a newsletter U.S. Speedskating issued that

23

informed skaters they could reach out to their athlete representative for assistance—in one issue, plaintiff's mentor/assailant was referenced. Based on these allegations, the *Farrell* court held,

> "at this time, these alleged facts are sufficient to show that [U.S. Speedskating] and [plaintiff's mentor/assailant] had an agency relationship such that [the mentor/assailant's] alleged tortious conduct in New York would bring [U.S. Speedskating] within the Court's jurisdiction. Nonetheless, based on the intertwined connection between [plaintiff's mentor/assailant] and [U.S. Speedskating], for which [the mentor/assailant] was acting as an athlete and representative in 1997 when the alleged abuse took place, the Court concludes that New York's long-arm statute gives the Court specific personal jurisdiction over [U.S. Speedskating]."

*Id.* at 387. The same is true here. Each of Defendants employed various clergy members, who served as Defendants' agents and employees, and sexually abused Plaintiffs at various locations in New York, over the course of approximately six years.

Defendants are also liable for the rampant and longstanding sexual abuse by their priest and nuns under the corporate complicity/superior officer doctrine. A defendant is legally responsible for the acts of its employees and/or appointed volunteers even if those acts are intentional or criminal, if management and/or a superior officer authorized, participated in, consented to, ratified and/or affirmed the conduct in question. *See Loughry v. Lincoln First Bank*, 67 N.Y.2d 369 (N.Y. 1986); and *Bianco v Flushing Hospital Medical Center*, 79 A.D.3d 777 (N.Y. App. Div. 2010). Here, superior officers of each of Defendants' organizations participated in the abuse. Moreover, they ratified and affirmed the abuse by hiring pedophile priests and nuns and ignoring the clear warning signs that Plaintiffs were being violently raped.

### B.   Defendants Transacted Business in New York CPLR § 302(a)(1)

Defendants transacted business in New York by advertising in New York, by accepting payment from Plaintiffs' family in New York, and by contracting to take Plaintiffs to and from their home in New York.

Where there is evidence that a defendant purposefully availed itself of the privilege of conducting activities within the state by either transacting business in or contracting to supply goods or services to the state, and where there is a nexus between those activities and the alleged injuries, a court can exercise jurisdiction. See *D & R Global Selections, S.L. v. Bodega Olegario Falcon Pineiro*, 29 N.Y.3d 292 (N.Y. Sup. Ct. 2017); *Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, (N.Y. App. Div. 2016).

*Janklow v Williams,* a New York father entered into a contract with a non-resident to send his son to a "camp operated by defendants outside of the state; that the camp fee was paid in [New York] and the infant plaintiff was transported from [New York] to the camp by the defendants." *Janklow v Williams*, 43 Misc 2d 1053 (N.Y. Sup Ct. 1964). Among other things, "the defendants represented among other things that the infant plaintiff would be taught horseback riding under the control and supervision of the defendants and that said infant would be kept in a healthy condition and would be returned to his parents at the end of the season in the same condition." *Janklow*, 43 Misc 2d at 1055. But "on August 13, 1959, as a result of the defendants' breach of their express agreement, the infant was injured by one of the defendants' horses and sustained the injuries complained of." *Id.* The *Janklow* court found personal jurisdiction over the nonresident defendants, specifically because defendants had transacted business in the state when they had contracted with the infant plaintiff. *Id.   See also Wurtenberger v. Cunard Line, Ltd*., 370 F Supp 342 (S.D.N.Y.

1974) (where a surgeon-patient relationship began and ended in New York, this Court exercised long-arm jurisdiction over a foreign defendant pursuant to CPLR 302(a)(1)).

The factual allegations pleaded in Plaintiffs' FAC are almost identical to *Janklow*; the initial transaction occurred between Defendants and Plaintiffs' mother, when Plaintiffs' mother responded to an advertisement and contracted with Defendants that in exchange for tuition money, they would take Plaintiffs to school and give them a proper education. In fact, Plaintiffs have stated more continuous contacts with the State of New York than were alleged in *Janklow* because agents and employees under the Fall River Diocese and the Congregation of the Sacred Hearts agreed to transport Jane Doe 1 and Jane Doe 2 to and from their home in Brooklyn, New York over the course of six years at the beginning and end of the academic year; during holidays; and whenever otherwise necessary.

Below, and contained in Jane Doe 1's Declaration, is a copy of Jane Doe 1's report card, evidencing a contract was entered into between the Fall River Diocese and the Congregation of the Sacred Hearts:

Here, any of the five Defendants may argue that if they did not take part in the exchange of tuition money or the transportation of the Plaintiffs, that the Court cannot exercise long-arm jurisdiction. However, "jurisdiction is proper even if the Defendant never enters New York, so long as the defendant's activities here were *purposeful* and there is a *substantial relationship* between the transaction and the claim asserted." *Rushaid v Pictet & Cie*, supra, at 319 (emphasis added). Defendants purposely availed themselves to the citizens of New York by intentionally targeting and enrolling boarding students from the State of New York via directed advertising.

The second prong of CPLR 302(a)(1) permits the Court to exercise jurisdiction when the cause of action arise from the contacts with New York and there is an articulable nexus between the business transaction and the claim asserted. Per *Rushaid v Pictet & Cie* , "[t]his inquiry is relatively permissive and does not require causation, but merely a relatedness between the

27

transaction and the legal claim such that the latter is not completely unmoored from the former, regardless of the ultimate merits of the claim. The claim need only be in some way arguably connected to the transaction." *Id*. at 319

In the case at Bar, Defendants' transport to "religious education," is the very reason they were hired by Plaintiffs parents. But for Defendants' contractual agreement with the parents to take plaintiffs from New York and bring them to school in Massachusetts, the abuse would not have occurred.  Thus, there is a direct nexus between Defendants' New York contacts and the claim asserted.

The Oblates and the Grey Nuns of Montreal and the Grey Nuns of Quebec were third party beneficiaries of the contract between Plaintiffs' mother and the Fall River Diocese and the Congregation of the Sacred Hearts. *See Aievoli v. Farley*, 223 A.D.2d 613, 614, 636 N.Y.S.2d 833, 833 (1996) ("'In determining third-party beneficiary status it is permissible for the court to look at the surrounding circumstances as well as the agreement,'" and "'it is well settled that the obligation to perform to the third party beneficiary need not be expressly stated in the contract)'" (quoting *Trans-Orient Marine Corp. v. Star Trading & Marine, Inc*., 925 F.2d 566, 573 (2d Cir. 1991)).

The FAC and exhibits attached thereto details the ways in which the Oblates, the Grey Nuns of Montreal, and the Grey Nuns of Quebec participated in religious events—including masses, celebrations, performances, retreats, fundraisers, charity events, and funerals—at which minors from Sacred Hearts Academy, including Jane Doe 1 and Jane Doe 2 were expected to attend and perform at. FAC ¶¶ 27-28. Plaintiffs specifically recall nuns waking Jane Doe 1 and Jane Doe 2 in the middle of the night and telling them they were going to "sing and dance." As minor boarding students at Sacred Hearts Academy, a Roman Catholic boarding school, Plaintiffs' attendance and performance at Defendants' religious events was intended to increase "donations"

and other funds to the Oblates, the Grey Nuns, the Fall River Diocese, and the Congregation of the Sacred Hearts. *See* Jane Doe 1 Declaration. As such, there is a direct nexus between Defendants' New York contacts—as signatories and/or third-party beneficiaries of a contract with Plaintiffs' family—and the claims asserted in the FAC.

### C. Defendants Committed Tortious Acts in Maine, Massachusetts, Connecticut, Vermont, Rhode Island, and New Hampshire, Causing Injury to Plaintiffs CPLR § 302(a)(3)

Under CPLR 302(a)(3)(i), if a defendant A) committed tortious acts without the state of New York causing injury to person within the state of New York and B) regularly does or solicits business or engages in any other persistent course of conduct within New York, then the Court can assert long-arm jurisdiction over the defendant.

So, if the Court does not find long-arm jurisdiction under 302(a)(1) or 302(a)(2), it must consider that, "the purpose of sub[paragraphs] (i) and (ii) is to ensure the fairness of asserting jurisdiction over nondomiciliaries whose out-of-state acts cause local injury." Vincent C. Alexander, *Practice Commentaries*, McKinney's Cons Laws of NY, CPLR C302:11. The legislature created this subsection specifically for the important purpose holding non-New Yorker's liable for their tortious actions against New Yorkers.

Further, the Court must construe CPLR 302(a)(3) broadly because it is well established that exercising personal jurisdiction under CPLR 302(a)(3) will contravene the Federal Constitution only in "'rare'" cases. *Cole v Safety-Kleen Sys., Inc*., 189 AD3d 2168 (N.Y. App. Div. 2020). This subsection was enacted in 1966 and was designed to be "well within constitutional bounds" (12th Ann Rep of NY Jud Conf at 341). Subparagraphs (i) and (ii) "were deliberately inserted" to achieve that goal. *Ingraham v Carroll*, 90 NY2d 592, 596-597, (N.Y. 1997).

Here, all five Defendants indisputably committed tortuous acts in various locations throughout New York, Massachusetts, Vermont, and Maine. The Court can exercise long-arm jurisdiction because Defendants engaged in a persistent course of conduct when they repeatedly drove the Plaintiffs in and out of New York state in compliance with the contract with Plaintiffs' parents. Defendants picked Plaintiffs up and dropped them off in New York for holidays, summer vacations, and family visits. Further, they trafficked Plaintiffs in and out of up-state New York regularly as part of their local business deals with various New York parishes.

**D.** __Defendants owned and used real property in New York CPLR §302(a)(4)__

Under CPLR 302(a)(4), if defendants owned, used, and possessed real property situated within the state of New York, the Court can exercise long-arm jurisdiction over them. Here, multiple Defendants owned and used real property in New York state and are accordingly subject to the jurisdiction of this Court.

The Oblate Defendants continue to own and use real property in New York to this day. In 1942, *The Plattsburgh Daily* indicated that the oblates had a presence in Essex, New York, which continued though the 1960's when the *Lowell Sun* confirmed that they owned a vacation house in Essex. Plaintiffs also distinctly remember being taken to the Oblate-owned shrine in Essex, New York, which has since been demolished. To this day, The Oblates continue to have vacation, seminary, and/or training homes in Essex, Newburgh, and Buffalo, New York.[4]

Upon Information and belief, the Defendants Congregation of the Sacred Hearts also own and use real property in New York. Our Lady of Victory Church in Rochester, New York, according to their website, "was entrusted to the [Sacred Heart] congregation in 1928." *Our Story.*

---

[4] *See Oblate Vocation Stories: Fr. George Knab, OMI,* (May 21, 2018), https://oblatesusa.org/oblate-world-october-2020/my-vocation-story-fr-george-knab-o-m-i/

SSCC-USA.org. Defendant Congregation of the Sacred Hearts continued to operate this church while the Plaintiffs were being abused, through 1970 while their pastor Edward C. Callens was the priest.

## II.      Defendants' Due Process Rights Will Not Be Violated

### A.  Defendants Satisfied the Minimum Contacts Requirement by Purposefully Directing Their Activities At Residents Of New York.

In addition to showing that the Court has long-arm jurisdiction, Plaintiffs must show that Defendants satisfy the minimum contacts requirement of the due process clause. The minimum contact "requirement is satisfied if the defendant has purposefully directed his activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

"The crucial question is whether the defendant has 'purposefully availed itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws, such that the defendant should reasonably anticipate being haled into court there.'" *Best Van Lines*, 490 F.3d at 242-43 (citing *Burger King*, 471 U.S. at 474-75). "This requirement "ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts." *Yablon v. Dental Excellence of Blue Bell*, No. 07 CIV. 11040 (DLC), 2008 WL 11516565, at *4 (S.D.N.Y. Mar. 24, 2008) (quoting *Burger King*, 471 U.S. at 475).

In *D&R Global Selections*, the Court of Appeals found that a Spanish winery had sufficient minimum contacts with New York based on visits to New York to promote wine and to locate a New York distributor, which ultimately sold its wine in New York, but where the defendant had no offices or permanent presence in New York. *D&R Global Selections,* 29 N.Y.3d (N.Y. Ct. App. 2017). Further, so long as a commercial actor's efforts are purposefully directed toward residents

31

of another State, the U.S. Supreme Court has consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985).

Defendants purposefully directed certain activities to the State of New York by planning, paying for, and committing the acts that gave rise to Plaintiffs' claims. *See Giroux v. Foley*, No. 19-CV-00187, 2020 WL 1677073, at *4 (D. Vt. Apr. 6, 2020) ("Although a weekend trip is Defendant's only alleged contact with Vermont, 'even a single act can support jurisdiction' so long as 'it creates a substantial connection with the forum' based on the 'nature and quality and the circumstances of [its] commission'") (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 n.18 (1985)); *see also Goodyear*, 564 U.S. at 924 (holding a court examines "whether there was some act by which the defendant purposefully avail[ed] itself") (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)); *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957) ("It is sufficient for purposes of due process that the suit was based on a contract which had substantial connection with that State").

The Court has also held that parties who create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in that state for the consequences of their activities. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985). See also *Travelers Health Assn. v Virginia*, 339 US 643 (1950). In the case at Bar, Defendants created a continuing obligation to Plaintiffs when they committed to caring for them, educating them, and transporting them into and out of New York state whenever necessary. This continuing obligation was the basis for the duty *in loco parentis*; it was their duty to continuously shelter, nourish and protect these girls as citizens of the State of New York.

In *Darrow v. Hetronic Deutschland*, the Court held that long-arm jurisdiction based on indirect marketing does not violate due process rights. *Darrow v. Hetronic Deutschland*, 119 A.D.3d 1142, (N.Y. App. Div. 2014). The German defendant had "an exclusive agreement with H-USA to distribute its products to various locations in the United States, including New York." *Id*. H-USA distributed the products "through a network of regional distributors, one of which was designated to serve the New York market." Id., 119 A.D.3d at 1144. The German defendant was aware of this network and thus satisfied the minimum contact requirement. *Id*.

Here, as in *Darrow*, each of the Defendants were actively engaging in the advertisement to New York via indirect marketing when, in the Fall River newspaper, *The Anchor*, they boasted of enrolling New York students at their school. Moreover, Plaintiffs' parents saw and add while living in Brooklyn, New York.

Defendants satisfied minimum contacts requirements by purposefully directing advertisements to New York, boasting New Yorkers as students, and committing to care for New York residents.

**B.  Maintaining This Suit In New York Does Not Offend Traditional Notions of Fair Play and Substantial Justice.**

Justice demands that these two Plaintiffs get their day in court. Defendants cannot dodge accountability by claiming that any jurisdictional burden outweighs the social importance of giving a voice to victims.

In *Burger King Corp*, the Court held that, "The facts of each case must always be weighed in determining whether personal jurisdiction would comport with fair play and substantial justice." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985). Once minimum contacts are established by a defendant purposefully directing its activities at forum residents, the defendant "must present a compelling case that the presence of some other considerations would render

33

jurisdiction unreasonable." *Lamarca v. Pak-Mor Manufacturing Company*, 95 N.Y.2d 210 (N.Y. 2000) (quoting *Burger King Corp. v. Rudzewicz*, supra).

In *Burger King Corp.,* the United States Supreme Court held that subjecting a Michigan defendant to jurisdiction in Florida was appropriate and did not offend traditional notions of fair play and substantial justice, based solely on the fact that the contract with the Florida plaintiff created a substantial and continuing relationship. Other than the contractual relationship, the Michigan defendant had no contact with or connection to Florida. Nonetheless the United States Supreme Court deemed the Florida court's exercise of jurisdiction to be proper. Similarly, Defendants in this matter entered into a contractual agreement with Plaintiffs' parents in New York for Plaintiffs to attend school in Massachusetts under the long-term care of Defendants. Thus, the facts in the case at bar present a stronger argument for this court's exercise of jurisdiction than those in *Burger King Corp*.

There are specific factors the Court must consider in deciding whether jurisdiction would be unreasonable. A court must consider the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief. It must also weigh in its determination "the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies." *LaMarca*, supra, 95 N.Y.2d at 218 (quoting *Asahi Metal Indus. Co. v. Superior Ct. of Cal.*, 480 U.S. 102, 113 [1987]).

The shared interest of the several States is the honor and protection of all citizens. To exercise jurisdiction over Defendants is not to subject them to hardship, but to allow the justice system to answer the questions of law and fact at the heart of this case. Plaintiffs simply wish to access the truth of the matter and hold actual wrongdoers accountable.

The Court has referred to the fair play/substantial justice requirement as the "reasonableness test." *Cabot Hosiery Mills, Inc., v. 7mesh Industries Inc.* 2016 WL 9526678, (D. Vt. 2016) (quoting *Int'l Shoe Co.*, 326 U.S. at 316 [1945]). In doing so, the Second Circuit has held that "dismissals resulting from the application of the reasonableness test should be few and far between." *Metro. Life Ins. Co. v. Robertson-Ceco Corp*. 84 F.3d 560 (2d Cir. 1996). The case at bar is no exception.

### III.   New York's Statute of Limitations Applies Because Plaintiffs Were New York Residents at The Time of Their Abuse.

Plaintiffs were born in New York, grew up in New York, and called New York home. As such, they were residents, and the New York statute of limitations applies; under diversity jurisdiction, substantive law of the forum state is applied, and it is well established that choice-of-law principles are substantive matters.

New York's choice-of-law rule regarding statutes of limitation for causes of action that accrue without the state (CPLR 202, often called the 'Borrowing Statute') establishes that if the Plaintiff is a New York resident, then New York law applies. Therefore, the New York statute of limitation applies to the present matter. *Shapiro v Syracuse University et al*. affirms this notion, holding that, "pursuant to the resident exception of the borrowing statute, a claim that accrues in favor of a New York resident will be governed by the New York statute of limitations regardless of where the claim accrued." *Shapiro v Syracuse University et al*. 2022 NY Slip Op 04835 (N.Y. App. Div. 2022).

An individual can have only one state of residence for purposes of the borrowing statute. *Bache Halsey Stuart, Inc. v. Namm*, 446 F. Supp. 692 (S.D.N.Y. 1978). It is often necessary to examine the entire course of a person's conduct in order to draw the necessary inferences as to the relevant intent. *Id.*

Here, Plaintiffs were indisputably residents of New York. They went to New York doctors; they were considered Dependents for New York tax purposes; and once they got old enough, they had the opportunity to vote in New York city and state elections. The fact that they got part of their education in Massachusetts in no way strips them of their New York citizenship. They were unquestionably New York residents during the abuse, and now they deserve the full benefit of New York law.

**IV.** **The Child Victims Act Applies Because of the Legislative Intent to Benefit New York Survivors.**

The Child Victims Act ("CVA") created a two-year window for survivors of childhood sexual abuse to file suit against those who were responsible for their abuse. This law was created because the New York legislature acknowledged a historical deficiency in the State justice system's protection of young survivors. Survivors are unlikely to come to terms with their childhood sexual abuse until a much later age, "which has been estimated to be as high as 52 years old on average." 2019 Bill Text NY S.B. 2440 (statement of New York State legislature regarding the justification for passing the Child Victims Act); *See also Eliminating Limits to Justice for Child Sex Abuse Victims Act of 2022*, 117 P.L. 176, 2022 Enacted S 3103, (Signed by President Biden September 16, 2022).

The CVA is a remedial statute as it is "designed to correct imperfections in prior law." *Coffman v. Coffman*, 60 AD2d 18, 188 (N.Y. App. Div. 1977), quoting Statutes, McKinney's Cons. Laws of NY, Book 1, §35). Specifically, the CVA was enacted to remedy an injustice identified by the Legislature that results from applying restrictive statutes of limitation to claims of childhood sexual abuse. (*See* NY State Assembly Mem. Supp. Legislation, reprinted in Bill Jacket for 2019 S.B. 2440, at 7- 8 [Jan. 29, 2019] [noting that "[b]ecause of the[] restrictive statutes

of limitations, thousands of survivors are unable to sue," and concluding that passage of the CVA "will finally allow justice"]).

As a remedial statute, the CVA "should be liberally construed to effectuate [its] aim [] … [and] must be given a meaning consistent with the words chosen by the Legislature - those words define the scope of the remedy that the Legislature deemed appropriate." *Jensen v. General Elec. Co.*, 82 NY2d 77 (N.Y. 1993). The CVA does not have any express provisions limiting the revival period to sexual abuse occurring in New York. Certainly, if that were the Legislature's intent, it could have so provided. (See, e.g., Ins. Law §5104[a] [limiting the applicability of New York's serious injury threshold requirement to motor vehicle accidents occurring in New York] Defendants, citing a highly distinguishable case involving Florida residents, argue that because some of the Plaintiffs' sexual abuse occurred out of state, Plaintiffs should not be given the benefit of the Child Victims Act. *Shapiro v Syracuse University et al*., is a more recent and persuasive decision, however. *Shapiro v Syracuse University et al*., 2022 NY Slip Op 04835 (N.Y. App. Div. 2022). In *Shapiro*, an infant New Yorker was abused at an overnight camp in Massachusetts. Despite Defendants argument for dismissal on the grounds that the abuse occurred in Massachusetts, The Fourth Department Appellate Division found that the Child Victims Act still applied.

As clarified in *S.H. v. Diocese of Brooklyn*, "The legislative history of the CVA evinces a clear intent to benefit New York survivors of sexual abuse." It found that the sole contention that abuse occurred across state lines, is not enough to show the inapplicability of the Child Victims Act. *S.H. v. Diocese of Brooklyn*, 2020 N.Y. Slip Op. 32648(U), (Sup. Ct. N.Y., August 4, 2020, Silver, J.), affirmed 205 A.D.3d 180.

In *Wolloch v. Synagogue*, a 2022 New York County Supreme Court case involving the sexual abuse of an infant New Yorker at Yellowstone National Park found the CVA applicable. *Wolloch v. Synagogue.* 950017/2021 **(**Sup. Ct. N.Y., Aug. 18, 2022). In the summer of 1997, Plaintiff Wolloch, a sixteen-year-old minor, participated in a cross-country bus trip along with other minors, which was sponsored by defendant United Synagogue Youth. While at an overnight stop in Yellowstone National Park during the trip, an employee of defendants' abused the power of his position and sexually abused Wolloch. The Court held, "Defendants are not entitled to dismissal on the grounds that the complained of actions occurred outside of New York State," reasoning that it was not in the plain language of the CVA to exclude such abuse. *Id.* As such, the Court must not dismiss Plaintiffs' claims based on extra-territorial sexual abuse.

## V.     The Late Addition of Defendants is not Grounds for Dismissal

Fed. R. Civ. P. 21 provides that misjoinder of parties is *not* ground for dismissal of an action. See also *Viada v Osaka Health Spa, Inc*., 235 FRD 55 (SDNY 2005). This Court has further held that parties may be dropped or added by the court's own initiative at any stage in the action and to "serve the ends of justice and further the prompt and efficient disposition of the litigation." *Totaltape v. National Assoc. of State Bds. of Accountancy et al*., 85 Civ. 4241 (S.D.N.Y. Mar. 4, 1987).

Defendants Oblates and Grey Nuns are not prejudiced by the later addition of their names to this matter. In June 2021, the state of Maine lifted the statute of limitations, enabling anyone who has experienced childhood sexual abuse in Maine to file a civil claim against their perpetrator, no matter how long ago the abuse occurred. *See* Me. Rev. Stat. tit. 14, § 752-C.

Plaintiffs experienced abuse in Maine by both defendants who were named after the close of the filing period. Jane Doe 1 was taken by nuns to spend a summer of abuse in Main with

'Ralph.' Further, both young girls were taken by Sacred Hearts Nuns and Grey Nuns of Quebec and Montreal to an Oblate Seminary in Bucksport, Maine approximately five to ten times.

Because the suit could still be brought against Defendants in Maine, they are not prejudiced by being named with the other alleged abusers in the present matter. It is further in the interest of efficiency to name all interested parties rather than litigating unnecessarily multiple times and forcing Plaintiffs to retell the stories of their abuse numerous times.

As such, the late joinder of the Oblates and grey Nuns is not ground for dismissal under Fed. R. Civ. P. 21. and *Totaltape,* supra (S.D.N.Y. Mar. 4, 1987).

I would still include the lawsuit could be filed pursuant to VT law, newly passed federal law, and NY Gender Violence Act here.

### VI.      Venue is Proper And New York Law Must Apply Due to Choose-of-Law and Important Policy Concerns.

Under 28 U.S. Code § 1391(b), A civil action *may* be brought in (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

Here, because the events in question take place across multiple districts and states, Subsection 3 of 28 U.S.C. §1391(b) applies. This Court has personal jurisdiction for the above-noted reasons and this venue is therefore proper.

In addition to the issues raised above, Defendants' argument this case should be transferred to Massachusetts and/or Massachusetts law should apply must be denied by this Court due to an

important policy reason: "enforcing [Massachusetts's] charitable immunity statute would violate the public policy of New York State as embodied in the New York State Constitution, article I, § 16 and judicial decisions." *Begley v. City of New York*, 62 A.D.3d 739, 878 N.Y.S.2d 770 (2009).

In 1971, the State of Massachusetts enacted G.L.c. 231, Sect. 85K, providing that the liability of charitable institutions for torts committed while carrying out an institution's charitable purposes shall not exceed $20,000. As such, "[t]his case presents a conflict of law problem because the New York Court of Appeals abandoned the concept of charitable immunity more than 50 years ago on the ground that it 'was out of tune with the life about us, at variance with modern day needs and with concepts of justice and fair dealing'" *Begley v. City of New York*, 62 A.D.3d 739, 878 N.Y.S.2d 770 (2009) (citing Bing v Thunig, 2 NY2d 656, 667 [1957])).

In *Begley v. City of New York*, plaintiffs, who resided in New York, alleged their son was exposed to various substances at a New Jersey school, which caused a severe allergic reaction that led to his death. The New Jersey school moved for summary judgment dismissing the complaint and cross claims insofar as asserted against it on the ground that it is immune from liability under New Jersey's charitable immunity statute (NJ Stat Ann § 2A:53A-7), which provides, in relevant part, that a nonprofit organization that is organized exclusively for educational purposes is not liable for damages caused by the charity's negligence. The *Begley court instructed:*

> Where, as here, there is a "true conflict" between the law of New Jersey and the law of New York and the local law in each jurisdiction favors its own domiciliary, the law of the place of the injury ordinarily governs the case (*see Neumeier v Kuehner*, 31 NY2d 121, 128 [1972]). In this case, however, the Supreme Court properly applied the public policy exception to the ordinary choice of law rule because (1) there were sufficient contacts between the parties, the occurrence, and New York and (2) enforcing New Jersey's charitable immunity statute would violate the public policy of New York State (*see Schultz v Boy Scouts of Am.*, 65 NY2d 189, 202 [1985]) as embodied in the New York State Constitution, article I, § 16 and judicial decisions (*see Rosenthal v. Warren*, 374 F Supp 522 [1974]; *Scharfman v. National Jewish Hosp. & Research Ctr.*, 122 AD2d 939 [1986]; *Rakaric v Croatian Cultural Club "Cardinal Stepinac Org."*, 76 AD2d 619 [1980]).

*Spolzino, J.P., Florio, Miller and Eng, JJ.*, concur. [*See* 15 Misc 3d 1107(A), 2007 NY Slip Op 50530(U)]).

*Id*. Accordingly, due to Massachusetts' charitable immunity statute, among other reasons, public policy concerns dictate New York law must be applied in this case as well.

### VII.   Conclusion

Plaintiffs are not required in pleadings to provide more details than are sufficient to state a cause of action, nor to prove the facts alleged. *See Nonnon v. City of New York*, 9 N.Y.3d 825, (N.Y. 2007). Further, as previously stated, a plaintiff "need only demonstrate that facts may exist to exercise personal jurisdiction over the defendant[s]." *Tucker v. Sanders*, 75 A.D.3d 1096, (N.Y. App. Div. 2010).

To dismiss any of the parties and/or claims at this juncture would be premature. Where jurisdictional facts are in the possession of a defendants, and there is some evidence that defendants were doing business in New York, a preliminary hearing should be held to determine whether they were in fact doing business in New York, before summarily dismissing complaint for lack of jurisdiction over said corporation. *Charles Abel, Ltd. v School Pictures, Inc*., 40 A.D.2d 944, (N.Y. App. Div. 4th Dep't 1972).

As such, Plaintiffs respectfully ask the Court to dismiss Defendants' motions to dismiss in their entirety. In the alternative, Plaintiffs request the opportunity to provide additional briefing and/or amend their pleadings.


Respectfully Submitted,

*/s/ Ashley Pileika*
Ashley M. Pileika
New York Bar No. 974605
Darren Wolf*
Texas State Bar No. 24072430

41

**Law Office of Darren Wolf, P.C.**
1701 N. Market St., Suite 210
Dallas, Texas 75202
P:  214-346-5355 | F: 214-346-5909
darren@darrenwolf.com
*Admitted *pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that on September 28, 2022, I electronically transmitted the attached document to the Clerk's Office using the ECF System for e-filing and transmittal of a Notice of Electronic Filing to the ECF registrants on record in this matter.

*/s/ Ashley M. Pileika*
Ashley M. Pileika